EDITORIAL "EL IMPARCIAL, INC.", demandante y recurrente, *v.* BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS, LOCAL NO. 901 ET AL., demandados y recurridos.

Número 12826.

*Sometido:* 14 de septiembre de 1960. *Resuelto:* 3 de marzo de 1961.

*José G. González, Benicio Sánchez Castaño, Eduardo Negrón Rodríguez y Félix Ochoteco, Jr.,* abogados de la recurrente; *George L. Weasler,* abogado de los recurridos.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

La peticionaria "El Imparcial, Inc.", acudió a la Sala de San Juan del Tribunal Superior en demanda de una orden preliminar de *injunction,* y luego permanente contra los aquí demandados. Alegó bajo juramento que se dedica a la impresión y venta del periódico "El Imparcial" que circula diariamente en y fuera de Puerto Rico, con oficinas, redacción, talleres y maquinarias ubicados en el edificio núm. 450 de la Calle Comercio esquina a Nolasco Rubio de la ciudad de San Juan y que la demandada Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, Local No. 901, es una organización obrera de acuerdo con la Ley Nacional de Relaciones del Trabajo y con las leyes del trabajo de Puerto Rico, siendo los demandados Frank Chávez, Federico Virella, Jaime

Amador y otras personas desconocidas, los oficiales o agentes en Puerto Rico de dicha organización obrera, y los co-demandados José Gil de Lamadrid, Humberto Trías, Pablo Ojeda, Roberto Agrinsoni, Frank Montoya, Cruz Roque Vicéns, Esli González, Eddie Vélez, Joaquín Oliveras y Rafael López Cepero, personas que han intervenido específicamente en los hechos que luego se exponen en la petición; que el 24 de mayo de 1960 la organización obrera demandada decretó un paro general o huelga del personal que integra la redacción del periódico "El Imparcial", habiendo acatado dicha orden de huelga 16 empleados de la peticionaria miembros de su redacción, de un total de 44 miembros, y que la demandada invocó para decretar dicho paro o huelga el haberse despedido a un miembro de la mencionada redacción del periódico.

La cuestión en litigio requiere que expongamos detalladamente los hechos que alegó la peticionaria como fundamentos para que se decretara un *injunction*, a saber: que la organización obrera demandada, por sus oficiales, empleados y agentes, y las personas mencionadas han cometido, o participado en, o incitado a otros a cometer, actos de violencia, y continuaban haciéndolo, tales como el mantener ininterrumpidamente *"piquetes"* en masa frente por frente a la entrada principal del edificio del periódico "El Imparcial" y en la puerta posterior, en tal forma que han impedido e impedían la libre entrada a las dependencias de la peticionaria, y los integrantes de dichos *"piquetes"* usaban frecuentemente un lenguaje soez y ofensivo, insultante a la moralidad, honradez e integridad de los empleados, funcionarios y agentes de la peticionaria, provocándolos con epítetos injuriosos y desafiándolos a contender a través de la fuerza y la violencia, estando tales *"piquetes"* en su mayoría formados por personas que no eran miembros o empleados de la demandada y extrañas al cuerpo de empleados de la peticionaria; el haber creado los demandados durante el mantenimiento de dichos *"piquetes"* un clima de violencia y de ataque tanto contra los directores y empleados de la peticionaria como contra el público que ha

pretendido entrar en sus dependencias, y que por razón de dicho clima de violencia creado por la demandada y sus directores, asociados y sostenedores, ocurrieron frente al edificio de la empresa una serie de actos violentos que se enumeran, consistentes de agresiones personales de los demandados realizadas en distintas fechas y momentos, a empleados de la peticionaria. Igualmente, que durante el mantenimiento de dichos "*piquetes*" la organización obrera demandada actuando a través de sus oficiales, agentes y miembros, y personas extrañas pero obedeciendo instrucciones de la misma, han cometido en distintas fechas actos de violencia que se detallan frente a la empresa en perjuicio de la propiedad e intereses de la peticionaria, sus oficiales y empleados; que en adición a los actos de violencia mencionados la organización obrera por sus oficiales y agentes, y los otros demandados, continuaban cometiendo, participando e incitando a que se cometieran nuevos acometimientos y agresiones contra los oficiales y empleados de la peticionaria y daños contra la propiedad y por iguales medios ilegales y por otros tales como la amenaza de causar grave daño corporal a dichos empleados y sus familiares, han impedido e impedían que los empleados de la peticionaria que nada tienen que ver con la huelga y que deseaban y trataban de entrar a su trabajo se arriesgaran a hacerlo ante el temor de recibir daño corporal o hasta la muerte; que tal estado de violencia ha impedido e impedía que la peticionaria pudiera continuar redactando, imprimiendo y distribuyendo el periódico, siendo el monto de las pérdidas que se le estaban ocasionando de no menos de $2,500 diarios; que los demandados amenazaban con continuar cometiendo actos de violencia y existía toda razón para creer que dichos actos de violencia continuarían cometiéndose a menos que se impidan mediante acción judicial; que la peticionaria ha sufrido y se halla sufriendo debido a la conducta ilegal de los demandados y por la intimidación, amenaza y coacción, no solamente de ellos sino de personas extrañas reclutadas por ellos, daños sustanciales e irreparables; que la conveniencia estaba a

favor de que se decretara el *injunction* ya que resultaría en mayor perjuicio para la peticionaria su negativa en comparación al que pudieran sufrir los demandados de decretarse el mismo, y que la demandante carecía de otro recurso en ley adecuado y eficaz como el remedio solicitado.

Aparte de los hechos expresados, la peticionaria alegó haber gestionado la intervención del Servicio de Conciliación del Departamento del Trabajo, habiéndose negado la organización demandada a someterse a conciliación, y alegó también, lo que constituye el nervio de la cuestión que está ahora ante nos en este recurso, que los funcionarios públicos encargados de proteger la propiedad de la peticionaria y la persona de sus oficiales y empleados, no obstante haberse esforzado por evitar dichos actos de violencia no han podido ni pueden ofrecerle adecuada y total protección. A tono con las anteriores alegaciones solicitó del tribunal que decretara un *injunction* contra los demandados prohibiendo realizar los actos de violencia expuestos y todo otro acto de amenaza, intimidación o coacción contra los empleados de la peticionaria, su propiedad o la propiedad usada por ella, y contra personas y clientes que visiten sus dependencias; emplear propaganda o cualquier medio insultante a la moralidad, honradez e integridad de sus empleados, funcionarios y agentes que deseaban seguir en sus càrgos, así como el establecer y mantener *"piquetes"* de manera tal que obstruyan la libre entrada y salida de sus dependencias y que no sean pacíficos y congruentes con los derechos que pudieran ejercer los demandados conforme a la ley; en una disputa obrera.

Citadas las partes para una vista celebrada el 15 de junio de 1960, en dicha fecha los demandados radicaron una contestación admitiendo algunos hechos y negando, por falta de información, los actos de violencia alegados. Levantaron entre otras defensas afirmativas la falta de jurisdicción del tribunal para entender de este asunto, y que los actos alegados, de haberse cometido, fueron cometidos o incitados por otra organización obrera, quien sería la responsable de dichos

actos. En torno a este planteamiento los demandados solicitaron permiso para radicar, y sometieron con la contestación, una demanda contra tercero alegando que de ser cierto lo expuesto por la peticionaria, la única responsable sería la tercera demandada Seafarers International Union of North America, suplicando que se ordenara a ésta contestar las alegaciones contenidas en la petición de *injunction* y que se dictara sentencia haciéndola responsable. En una moción para desestimar por falta de jurisdicción, alegó la organización obrera demandada, llamándose a sí misma Tronquistas, que ella representaba a empleados de la peticionaria que estaban en huelga enfrascados en una disputa obrera en relación con el despido ilegal del empleado Jesús Rodríguez Benítez por motivo de su afiliación y sus actividades a favor de los Tronquistas demandados, y que este despido ilegal estaba siendo investigado por la Junta Nacional de Relaciones del Trabajo; que la propia peticionaria había radicado cargos en la Junta Nacional de Relaciones del Trabajo contra los alegados actos de violencia como violaciones del estatuto federal que estaban siendo investigados por la oficina regional de la Junta; que la peticionaria tenía un remedio adecuado y eficaz en derecho para evitar dichos actos de violencia a través de la Junta Nacional de Relaciones del Trabajo, y que durante el curso de la huelga de los Tronquistas la Asociación de Fotógrafos, Camarógrafos y Técnicos de Prensa de Puerto Rico, representante acreditada de los empleados del departamento fotográfico de "El Imparcial" se unió a la huelga y dicha Asociación había radicado en la Junta Nacional de Relaciones del Trabajo cargos contra la peticionaria alegando que ésta se negaba ilegalmente a negociar con ella. Copias de los cargos mencionados radicados por una y otra parte ante la Junta Nacional se unieron al expediente.

El récord taquigráfico de los procedimientos que tuvieron lugar en la vista celebrada demuestra, en cuanto a la demanda de tercero, que la Sala sentenciadora dispuso que dicha demanda de tercero no procedía en ese estado del procedi-

miento porque ello obligaría a citar a la tercera parte y permitirle sus alegaciones lo que le quitaría el carácter sumarísimo que tenía la vista de *injunction* preliminar, y reservó a los demandados cualquier derecho que tuvieran a levantar esta cuestión si el caso iba a una vista sobre *injunction* permanente. La Sala, no obstante, expresó que si de la prueba surgía que terceras personas ajenas a los demandados eran los causantes de esos actos, la petición habría que desestimarla. (¹)

■ En lo que respecta a la cuestión jurisdiccional, la posición de los demandados durante la vista fue al efecto de que la Junta Nacional de Relaciones del Trabajo era el organismo específicamente dispuesto por el Congreso para resolver disputas obreras aunque luego admitieron que si dicha Junta Nacional de Relaciones del Trabajo no asumía jurisdicción, la peticionaria podría tener derecho a acudir al Tribunal Superior alegando que carecía de un remedio adecuado. La Sala sentenciadora desestimó dicho planteamiento jurisdiccional. Los demandados-recurridos no han insistido ante nos en la falta de jurisdicción de la Sala sentenciadora para conocer de este asunto, pero estando en ello envuelta nuestra propia jurisdicción también, diremos sin mayor argumentación que habiéndose alegado y, todavía más, probado sin lugar a dudas la comisión de actos ilegales de fuerza y violencia, aun cuando lo fueran en el curso de una disputa obrera y aun cuando la empresa peticionaria cae bajo la Ley Nacional de Relaciones del Trabajo, la jurisdicción del Tribunal Superior, que correctamente asumió, está ampliamente sostenida. Véanse: *Allen-*

(¹) No es necesario que nos detengamos a examinar la procedencia o no de una demanda de tercero en un procedimiento de *injunction* preliminar bajo la Ley 50 de 4 de agosto de 1947, aquí aplicable. Resulta evidente que a tenor de las alegaciones de su demanda de tercero los demandados pretendían situar en otra unión la responsabilidad por los actos imputados a ellos en la demanda, lo cual también hicieron en su propia contestación por vía de defensa afirmativa. Es obvio, pues, que la anterior resolución del tribunal sobre la demanda de tercero a los fines del *injunction* preliminar no les impedía ofrecer prueba para sustanciar tal defensa afirmativa, lo cual no hicieron.

*Bradley Local* v. *Board*, 315 U. S. 740; *Hotel Employees* v. *Sax Enterprises*, 358 U. S. 270, pág. 271; *Youngdahl* v. *Rainfair, Inc.*, 355 U. S. 131, págs. 137, 138; *Auto Workers* v. *Wisconsin Board*, 351 U. S. 266, págs. 272–274; *United Workers* v. *Laburnum Corp.*, 347 U. S. 656, págs. 663–665; *Garner* v. *Teamsters Union*, 346 U. S. 485, pág. 488; *Automobile Workers* v. *O'Brien*, 339 U. S. 454, pág. 459. Y véase: *Truax* v. *Corrigan*, 257 U. S. 312. Cf:—*Plumbers' Union* v. *Door County*, 359 U. S. 354, pág. 357 (escolio 5) ; *San Diego Unions* v. *Garmon*, 359 U. S. 236, págs. 247–248 y escolio 6; *De Veau* v. *Braisted*, 363 U. S. 144, págs. 147, 151–152; *Automobile Workers* v. *Russell*, 356 U. S. 634, pág. 640; *Weber* v. *Anheuser-Busch, Inc.*, 348 U. S. 468, págs. 476–477; *Labor Board* v. *Rice Milling Co.*, 341 U. S. 665, pág. 672; *Building Service Union* v. *Gazzam*, 339 U. S. 532, pág. 537; *Auto Workers* v. *Wisconsin Board*, 336 U. S. 245, págs. 252–253; *Drivers Union* v. *Meadowmoor Dairies, Inc.*, 312 U. S. 287, págs. 292–295. *Teamsters Union* v. *Vogt, Inc.*, 354 U. S. 284, pág. 289. Véanse además las siguientes decisiones de cortes estatales: *Southern Bus Lines* v. *Amalgamated Ass'n. etc.* (Miss.), 38 So.2d 765, pág. 770; *General Bldg. C. Ass'n.* v. *Local Unions Nos. 542, etc.*, (Pa.) 87 A.2d 250, págs. 254–255, y *Anotación* en 32 A.L.R.2d 829; *McCarroll* v. *Los Angeles County Dist., etc.*, (Cal.), 315 P.2d 322, pág. 332, cert. denegado, 355 U. S. 932; *Lindsay* v. *Teamster Union*, 97 N.W.2d 686, (N.D.) págs. 693–694; *Taylor Fibre Co.* v. *Textile Workers Union of America*, (Pa.) 151 A.2d 79, págs. 81–82; *Minor* v. *Building & Construction Trades Council*, (N.D.) 75 N.W.2d 139, págs. 144–147; *McLean Distrib. Co.* v. *Brewery & Bev. Drivers, etc.*, (Minn.) 94 N.W.2d 514, págs. 520–521, cert. denegado, 360 U. S. 917. Esas autoridades reafirman incuestionablemente el principio de que las actividades ilegales de violencia, aun cuando ocurrieren en el curso de una legítima disputa obrera cubierta por la legislación federal de relaciones del trabajo, no caen dentro de la esfera de dicha legislación ni están protegidas por la misma, siendo

de primordial incumbencia de las autoridades locales el mantenimiento del orden y de la seguridad pública.

■ Vayamos a los méritos. Por la Ley núm. 50 de 4 de agosto de 1947, 29 L.P.R.A. secs. 101-109, la Asamblea Legislativa de Puerto Rico privó a los tribunales de justicia de facultad para conceder *injunctions* en los casos que envuelvan o que surjan de una disputa obrera, salvo de la manera restrictivamente permisible en dicha Ley.([2]) En el artículo 2 se le negó a los tribunales jurisdicción para conceder un *injunction* preliminar o permanente o una orden de entredicho prohibiéndole a una persona o personas participantes o interesadas en una disputa obrera realizar individual o concertadamente, entre otros, los siguientes actos: (*a*) Cesar en la ejecución o rehusar ejecutar cualquier trabajo o continuar en cualquier relación de empleo; (*b*) Hacerse miembro o continuar como miembro en cualquier organización obrera; (*c*) ......; (*d*) ......; (*e*) Dar publicidad a la existencia o a los hechos envueltos en cualquier disputa obrera, bien sea anunciando, hablando, patrullando o por cualquier otro medio *que no envuelva fraude o violencia;* (*f*) Reunirse *pacíficamente* para actuar o para organizarse o para actuar en pro

---

([2]) La Ley 50 de 4 de agosto de 1947 fue una adopción casi literal por nuestra Asamblea Legislativa de la Ley Norris-La Guardia de 1932, 29 U.S.C.A. §§ 101-115, que privó a las cortes de los Estados Unidos de su jurisdicción equitativa para conceder *injunctions* en casos de disputas obreras, excepto de la manera rigurosamente limitada en que el Congreso les permitió seguir ejerciendo tal facultad. La situación entonces imperante con todos sus efectos y proyecciones en la economía nacional y en las deseables relaciones obrero-patronales que indujo al Congreso a adoptar tan drástica medida limitativa del poder de los tribunales federales surge, en su chocante crudeza, de los movidos debates que tuvieron lugar en el Congreso durante la discusión de dicha ley: *Congressional Record,* Vol. 75, págs. 5462-5515, (Cámara); págs. 4502-4511, 4618-4630, 4676-4696, 4754-4761, 4762-4780, 4914-4920, 4927-4939,4996-5019 (Senado). La lectura de esos debates deja en claro que históricamente aquí no existía la situación que la Ley Norris-La Guardia quiso conjurar. Sin embargo, en ausencia de expresión legislativa en el historial del proyecto que luego fue la Ley 50, debemos concluir que el estatuto se adoptó en 1947 para fines de igual política pública a la contenida en la sección 2 de la Ley Norris-La Guardia, 29 U.S.C.A. § 102, para la protección del trabajo organizado, y con la interpretación dada por los tribunales de justicia a iguales disposiciones de este estatuto.

de sus intereses en una disputa obrera; (*g*) . . .; (*h*) . . .; (*i*) Acordar con otras personas el hacer o no hacer los actos anteriormente especificados; y (*j*) Aconsejar, urgir o de otro modo promover o inducir *sin fraude ni violencia* los actos anteriormente especificados.

De acuerdo con el artículo 5 de la Ley núm. 50, ningún tribunal tendrá jurisdicción para expedir un *injunction* en un caso que envuelva o que surja de una disputa obrera contra persona o personas participantes o interesadas en dicha disputa, excepto después de oir el testimonio de testigos en corte abierta en apoyo de alegaciones hechas bajo juramento y a menos que el tribunal haga todas las siguientes conclusiones de hecho:

(*a*) que se ha amenazado cometer y se cometerán *actos de fraude o violencia,* a menos que se impidan o se han cometido y continuarán cometiéndose dichos actos a menos que se impidan pero no se expedirá ningún *injunction* ni orden de entredicho temporal con motivo de amenaza o acto alguno de fraude o violencia excepto contra la persona o personas o la asociación u organización que hiciere la amenaza o cometiere el acto de fraude o violencia o que realmente autorizare dicho acto después de tener conocimiento real del mismo;

(*b*) que habrán de resultar daños sustanciales e irreparables a la propiedad física del querellante;

(*c*) que en cuanto al remedio solicitado para cada alegación resultaría mayor perjuicio para el querellante negándosele el remedio que el que habría de resultar para los querellados si se concediera el remedio;

(*d*) que el querellante no tiene ningún otro recurso adecuado en derecho; y

(*e*) que los funcionarios públicos encargados del deber de proteger la propiedad del querellante no pueden o no están dispuestos a proporcionar la protección adecuada.

Después de oir prueba, toda ella aportada únicamente por la parte peticionaria, la Sala sentenciadora halló satisfactoriamente probado que entre la empresa y algunos de sus empleados surgieron disputas en relación con el contrato de trabajo de los mismos y que dichas disputas culminaron en

una huelga que declararon dichos empleados comenzada el 24 de mayo del corriente año; que como parte de las actividades huelgarias se establecieron *"piquetes"* frente al edificio ocupado por la peticionaria desde esa fecha los cuales se habían mantenido sin interrupción, estando dichos *"piquetes"* compuestos por empleados de ella y por personas identificadas como miembros o afiliados de la organización obrera demandada conocida como Unión de Tronquistas, y más tarde por personas identificadas como miembros o afiliados de otra unión obrera conocida como Seafarers International Union y que como resultado de la huelga y de los *"piquetes"* establecidos el periódico "El Imparcial" dejó de publicarse desde el 30 de mayo hasta el 13 de junio de 1960 en que se reanudó la publicación con un número reducido de páginas. Concluyó la Sala sentenciadora, por la prueba practicada, que de los *"piquetes"* y de personas simpatizadoras con el movimiento huelgario individualmente aquí demandadas surgieron incidentes tales como agresiones a empleados de la peticionaria, insultos al Director de la empresa, daños a una ventana del local ocupado por dicha empresa y daños a un automóvil del Director y que en ocasiones se trató de impedir y se impidió la entrada al edificio de empleados de la peticionaria que habían permanecido en el trabajo; se les insultó y se les destruyó la comida que en ocasiones desde fuera se les había enviado. También se trató de impedir en ocasiones la entrada al edificio de personas que han tenido negocios con la peticionaria y con otras entidades y personas ocupantes de dicho edificio. A los oficiales policíacos allí destacados se les había dirigido en ocasiones insultos y provocaciones.

Por otra parte fue de opinión la Sala sentenciadora que la policía había prestado protección a la peticionaria y cuidado del mantenimiento del orden frente y en los alrededores del edificio ocupado por "El Imparcial"; que en las ocasiones en que se efectuaron agresiones o daño a la propiedad la policía procedió pronta y eficazmente "arrestando a las personas culpables y sometiéndolas a la acción judicial" y que la gestión

policíaca fue efectiva en cuanto permitió la reanudación de la publicación y distribución del periódico y en cuanto a que los actos individuales de violencia se habían reducido considerablemente. Finalmente concluyó que los actos de violencia ocurridos últimamente [el fallo del Tribunal Superior fue dado en 17 de junio de 1960] no lo fueron contra la peticionaria y sí *entre miembros y afiliados de la Unión de Tronquistas y la referida unión de marinos.* Ante esas conclusiones resolvió la Sala sentenciadora que aun cuando los hechos probados cumpliesen los requisitos (*a*), (*b*), (*c*) y (*d*) antes transcritos del artículo 5 de la Ley 50 de 1947, la prueba no había establecido el requisito del apartado (*e*), y se declaró sin jurisdicción en los méritos para conceder el *injunction* preliminar solicitado. (³) Contra ese fallo la peticionaria interpuso el presente recurso ante nos a tenor de las disposiciones especiales del artículo 8 de la referida ley.

Pero antes de que consideremos los méritos del fallo recurrido, es preciso disponer de un aspecto previo del caso, también jurisdiccional, sobre el cual la Sala sentenciadora no hizo conclusión ni se manifestó en forma alguna, y el cual tampoco ha sido discutido ante nos por las partes. Nos referimos a la disposición contenida en el artículo 6 de la Ley 50 al efecto de que: "[N]o se concederá ninguna orden de entredicho o recurso de *injunction* a ningún querellante que haya dejado de cumplir con cualquiera de las obligaciones fijadas por las leyes envueltas en la disputa obrera en cuestión, o que haya dejado de realizar todo esfuerzo para el arreglo de dicha disputa obrera mediante negociación, intervención del Servicio de Conciliación y arbitraje voluntario." Como podrá verse, la anterior disposición constituye un impedimento

---

(³) No cabe la menor duda de que en este caso hay envuelta una disputa obrera según dicho término se define en el artículo 9 de la Ley 50, aun cuando más tarde interviniera una unión rival, siendo de estricta aplicación las disposiciones de dicha ley. Cf: *Negro Alliance* v. *Grocery Co.*, 303 U. S. 552; *Milk Wagon Drivers' Union* v. *Lake Valley Co.*, 311 U. S. 91; *Allen Bradley Co.* v. *Union*, 325 U. S. 797, págs. 805 (11), 807 (escolio 12); *Telegraphers'* v. *Chicago & N. W. R. Co.*, 362 U. S. 330; *Marine Cooks* v. *Panama S. S. Co.*, 362 U. S. 365.

absoluto para la concesión de un *injunction* en casos de disputas obreras a menos que el querellante haya asumido la actitud conciliadora y realizado los actos que se especifican para arreglar la disputa. En torno a igual disposición contenida en la Ley Norris-LaGuardia, 29 U.S.C.A. sec. 108, ha existido desde un principio un conflicto de criterio entre las cortes en cuanto a si la misma se aplica o no se aplica cuando se trata de la comisión de actos ilegales de violencia. De ser aplicable tal disposición en los casos en que el remedio se solicitare basado en la comisión de actos de violencia, no bastaría con que el tribunal hiciera todas las conclusiones de hecho dispuestas en el artículo 5. Aún estaría impedido de conceder el remedio de no haberse probado el hecho de que la parte que lo solicita ha realizado todo esfuerzo para el arreglo de la disputa mediante negociación, conciliación y arbitraje voluntario. El Tribunal Supremo de Estados Unidos en *Brotherhood of Railroad Trainmen* v. *Toledo, P. & W. R. Co.*, (1944) 321 U. S. 50, casi no deja lugar a dudas de que la referida disposición de la Ley Norris-La Guardia, igual al artículo 6 de la nuestra, se aplica, y debe cumplirse con la misma para la concesión de un *injunction* aun en aquellos casos en que se invoque la comisión de actos ilegales de violencia.(⁴) Sin embargo, esta decisión reconoce que puede haber excepciones en que el remedio sea concedido sin que el peticionario haya cumplido con dicho requisito. En cuanto a cuáles puedan ser tales excepciones y la extensión o el grado en que las gestiones de arreglo deban realizarse, según las

---

(⁴) En este caso de *Brotherhood of R. Trainmen* v. *Toledo P. & W. R. Co.*, estaba envuelta en la disputa obrera la ley del trabajo en los ferrocarriles de 1934 ("Railway Labor Act"), 48 Stat. 1185, la cual obligaba a la negociación directa de la disputa, y disponía mediación y arbitraje voluntario entre las partes. El patrono negoció directamente y fue a la mediación, pero se negó una y otra vez a someterse al arbitraje voluntario a lo cual estuvo dispuesta la Unión. Dijo el Tribunal que si el patrono hubiera utilizado el arbitraje, pudo haberse evitado la huelga, la violencia que siguió a la misma y la necesidad del *injunction*. Los hechos ocurrían en diciembre de 1941 cuando surgió una emergencia nacional por el ataque a Pearl Harbor.

circunstancias en cada caso, no está claramente sentado. Para una discusión del problema en diversos aspectos véanse la *Anotación* en 150 A.L.R. 819, que sigue al caso de *Brotherhood of R. Trainmen* v. *Toledo, etc.* y casos citados en la misma. Véase también *J. B. Michael & Co.* v. *Iron Workers Local, etc.*, (1959) 173 F. Supp. 319, págs. 325–326.

La prueba ante nos demuestra (Récord págs. 12–20) que el primero de junio de 1960, después de varios días de haberse decretado la huelga y de haberse estado cometiendo actos de violencia y antes de iniciarse el presente recurso en junio 9, la peticionaria requirió personalmente los servicios del Director del Negociado de Conciliación y Arbitraje Sr. Adolfo D. Collazo tratando de buscar una solución a este conflicto obrero; que el Sr. Collazo se comunicó con el Sr. Chávez representante de la Unión de Tronquistas y le invitó a una reunión para el día 2 de junio a la cual comparecieron tres representantes de esta organización obrera y comparecieron representantes de la peticionaria; que además había otro conciliador del Departamento del Trabajo y que la reunión no cumplió los objetivos para los cuales se citó porque los representantes de la Unión se retiraron alegando que "El Imparcial" no había comparecido de buena fe porque había radicado un cargo contra la Unión; que el conciliador les informó que debían hacer todos los esfuerzos por tratar de resolver el problema y alguien, en representación de la empresa, también manifestó que discutiendo el problema podría llegarse a un acuerdo. Los representantes de la Unión se levantaron para retirarse y el Lcdo. González en representación de la peticionaria les invitó a que continuaran la reunión, que posiblemente podría resolverse el problema discutiéndolo; que la representación de la peticionaria también les pidió que formularan sus demandas y dijeran lo que deseaban y que a esto los representantes de la Unión insistieron en retirarse y se retiraron. Los últimos que se retiraron del local donde se celebraba la reunión fueron los representantes de "El Imparcial".

Asumiendo nosotros ahora la posición, a tono con el espíritu restrictivo de la Ley 50 contra la concesión de *injunctions* en este tipo de casos, que el artículo 6 de la misma se aplica por igual en aquellos casos en que se imputa como motivo para solicitar el remedio la comisión de actos de violencia, y que por lo tanto ha de darse cumplimiento a lo dispuesto en dicho artículo 6 como condición previa a que se decrete un interdicto, y sin que se entienda que estamos ahora expresando criterio en cuanto a cuál sería la posición a ser asumida en otras circunstancias, o de estar envueltas en la disputa obrera relaciones obrero-patronales de otra naturaleza, diremos, a los efectos de este caso y del *injunction* preliminar solicitado, que el récord demuestra que la peticionaria cumplió sustancialmente con las gestiones de conciliación y arreglo de la disputa requeridas por el artículo 6 de la Ley 50. Dispuesto de este aspecto del caso, pasaremos a considerar el fallo dado por el Tribunal Superior.

Según dijimos antes, la Sala sentenciadora se pronunció sin jurisdicción por entender que no se había probado el requisito dispuesto bajo el apartado (*e*) del artículo 5, "Que los funcionarios públicos encargados del deber de proteger la propiedad del querellante no pueden o no están dispuestos a proporcionar la protección adecuada." La recurrente no arguye que la policía no estuviera dispuesta a ofrecerle protección y, obviamente, el récord no demostraría lo contrario, pero sí sostiene que no obstante el deseo y propósito de los agentes de orden público en tal sentido, la evidencia demostró que no podían brindar una protección completa y adecuada.

El Oficial de la Policía Capitán Luis M. Pérez declaró sobre varias agresiones y actos de violencia que él presenció cometidos en distintas ocasiones por los demandados Humberto Trías, Cruz Roque Vicens y José Gil de Lamadrïd en las personas de empleados de la peticionaria sin que hubiera provocación por parte de éstos, algunas de dichas agresiones efectuadas en la entrada misma del edificio de "El Impar-

cial". Ocurrían en la cercana presencia de los agentes del orden público y sus oficiales, y no obstante el arresto inmediato de los infractores, a veces se repetían por las mismas personas. Identificó a otros demandados como personas que intervenían en el movimiento huelgario y lo dirigían, y dijo que pertenecían a la Unión de Tronquistas. El testigo declaró sobre expresiones insultantes que surgían del *"piquete"* tales como "Ayuso, asesino, cobarde, mataste a Aguilita, sal de ahí, sal para afuera" y otras frases, expresiones éstas vertidas frente a la entrada del edificio. Además de los incidentes de violencia que relató el oficial manifestó tener conocimiento de la ocurrencia de otros que no presenció personalmente. Formaban *"piquetes"* empleados de la peticionaria y personas que no lo eran. Frecuentemente se usaban altoparlantes, con más frecuencia cuando había empleados en el interior del periódico. Los *"piquetes"* se mantenían continuamente las 24 horas de día y de noche. A preguntas del abogado de los demandados el Capitán Pérez declaró:

"P. Capitán Pérez, ¿no es un hecho que durante la huelga cuando la violencia estaba ocurriendo, en una ocasión habían tanto como 200 ó más *"piquetes"* de la S.I.U. en el área donde la violencia ocurría? R. Eran más o menos tantos como los tronquistas, si los tronquistas tenían gente, una noche encontré como más o menos más de 50 que vinieron desde Ponce. Cuando les pregunté de qué sitio eran me dijeron yo soy .de Ponce. P. ¿Usted sabe de dónde venían los *"piquetes"* del S.I.U.? R. De diferentes sitios, de Santurce, habían americanos, dos, tres o más . . . . . P. Marinos regulares. Durante este período de tiempo cuando habían 200 ó 300 *"piquetes"* de la S.I.U. presentes y un número parecido de los tronquistas, ¿no es un hecho que en algunas ocasiones pudo haber 100 ó 200 policías en ese momento? R. Nunca tuvimos 200 policías."

El testigo describió hasta un máximo de 63 policías desplegados en distintos sitios del área. Luego dijo que al presente la gente entraba y salía del edificio de "El Imparcial" sin que nadie los parara y que el periódico·se estaba imprimiendo y se vendía en las calles. También expresó, a pre-

guntas de la peticionaria, que las agresiones que presenció se habían cometido antes de establecerse los *"piquetes"* de la S.I.U. y nunca vio que los miembros de esta unión atacaran a los empleados de la empresa. Ultimamente había habido. problemas entre la S.I.U. y los Tronquistas y en su concepto el clima que prevalecía en los alrededores de "El Imparcial" no era normal.

El Teniente Primero Alejandro Oliveras, Comandante del Distrito de San Juan, se manifestó así después de mencionar varias agresiones y actos de violencia por parte de los *"piquetes"* contra empleados de la empresa, y provocaciones desde los *"piquetes"* frente al periódico, llamando a su dueño "criminal, abusador" y otras cosas por el estilo, algunas veces hechas por altoparlantes:

"P. ¿Y dígame, teniente, podría usted indicar cuál ha sido el clima que ha prevalecido en los alrededores de El Imparcial con motivo de esta conducta por parte de estos piqueteadores, de violencia y provocación? R. Ha prevalecido un clima de tensión muy pronunciada debido a los incidentes que se suscitaron allí con muchísima frecuencia. P. ¿Cuántos policías había allí, más o menos, o hay? . . . R. Hubo veces que hubo cuarenta o cincuenta hombres, otras veces hubo más, porque el sitio a cubrir donde se suscitaban estos incidentes era un sitio bastante amplio. *Es más, la policía se veía imposibilitada de prevenir, hasta donde fuera posible, estos incidentes.* P. Y mi pregunta ahora es la siguiente: si a pesar de los miembros de la policía en ese sitio, ¿cómo era posible que se suscitaran estas agresiones y provocaciones? R. *La situación era tan dispersa que nosotros humanamente no podíamos dar la protección que necesariamente se merecía el sitio y las personas allí.* P. ¿Es ésta la misma situación que prevalece en el presente? R. *Todavía."*

Explicó el Teniente que estos actos habían surgido frente a la entrada de "El Imparcial" muy cerca de la misma, en la calle Comercio, en la Avenida Fernández Juncos, en la Calle Nolasco Rubio, o sea en los alrededores del edificio que da a cuatro calles. En cuanto al libre acceso al edificio manifestó el testigo que habían surgido un número de incidentes y relató

la ocasión en que acompañando él a dos personas que deseaban ir a una agencia de cobros situada en dicho edificio el demandado Humberto Trías le gritó en alta voz delante del público, y lo repitió por distintas veces, que él (el Teniente) era el rompehuelga número uno de "El Imparcial". Tales incidentes se repitieron con distintas personas que fueron a entrar a oficinas que nada tenían que ver con el periódico. En los *"piquetes"* de donde surgieron las agresiones y provocaciones habían empleados de "El Imparcial" pero en su mayoría eran de la Unión de Tronquistas. Al momento de la vista del caso aún se mantenían las 24 horas del día. Reafirmó que no conocía de agresiones hechas por la otra unión a los empleados de la peticionaria, "sino más bien ha habido agresiones de parte de los tronquistas para empleados de El Imparcial y para los piqueteadores de los Seafarers".

A preguntas del abogado de los demandados expresó el Teniente Oliveras que ellos trataron de limitar los *"piquetes"* de una y otra parte a un número de diez después que la situación se puso muy tensa, que nunca hubo como 100 *"piquetes"* de la S.I.U. y lo sucedido era que de una y otra parte se había arremolinado el pueblo; hubo veces de haber más de 500 personas detrás de los piquetes de los tronquistas cerca de la entrada. En el otro extremo en la Avenida Fernández Juncos fuera del territorio de "El Imparcial" donde estaba la otra unión nunca hubo ni la cuarta o quinta parte de ese número. Después de referirse a varios demandados como personas que intervenían en la huelga, dijo el testigo que estas personas se confundían con un gentío enorme que allí había y que luego hubo que tomar medidas para desalojar el sitio. A la policía se le lanzaron tres bombas "Molotov" que estallaron en el mismo sitio en que estaban los agentes tratando de establecer el orden. No pudieron determinar quiénes lanzaron esas bombas. También describió el Teniente Oliveras la situación de provocaciones, amenazas e insultos desde el *"piquete"* al periódico y a las personas que se mantenían dentro. El demandado Gil de Lamadrid exhortaba al público subido en la

capota de una guagua en forma tal que si veían entrar un rompehuelga tomaran la acción que fuera necesaria, y que en cuanto a la policía, que ya ellos sabían lo que tenían que hacer. Otro exhortaba al público a que impidieran por cualquier medio la entrada de alguna persona al periódico. El demandado Ojeda gritaba por los amplificadores que los oficiales de la policía estaban cogiendo dinero de "El Imparcial", y repitió esa frase en presencia de un magistrado, y en presencia del mismo magistrado manifestó que tenían que ganar esa huelga contra todos los imposibles *aunque haya que derramar sangre.* Uno de los *"piquetes"* miembro de la Unión de Tronquistas de nombre Angel Luis Vélez ofreció $1,000 ante un grupo de personas porque mataran al testigo, Teniente Oliveras. Relató que en su presencia el demandado Trías Conde causó daños al automóvil del Director Sr. Ayuso, hundiéndole la capota con una piedra como de diez libras de peso.

El Comandante Benigno Soto, a cargo de la fuerza policíaca del área metropolitana, declaró a preguntas de la peticionaria:

"P. ¿Podría usted indicar cuál era el ambiente que prevalecía o prevalece allí alrededor de El Imparcial? R. Bueno, un ambiente . . . . , está alterado allí el ambiente, no es normal; es anormal el ambiente. P. ¿Conforme a la apreciación que usted ha hecho de ese ambiente anormal alrededor de El Imparcial, considera usted, por su experiencia policíaca que puede la empresa El Imparcial desenvolver su negocio normalmente? R. No señor, yo creo que no. P. Usted ha hablado de varias agresiones ya de que usted ha tenido conocimiento. Mi pregunta es la siguiente: ¿Ha habido vigilancia policíaca en todo ese movimiento obrero en los alrededores de El Imparcial? R. Bueno, los alrededores inmediatos, los alrededores sí, pero fuera de ese ámbito no. Muy poca. P. ¿Cómo se explica usted que hayan ocurrido agresiones personales en los alrededores de El Imparcial no obstante haber esa vigilancia que han mantenido ustedes? R. *Bueno, nosotros no podemos desglosarnos en forma tal que podamos dar una protección adecuada a las personas allí. Hay veces que esas agresiones ocurren fuera del ámbito donde estamos nosotros trabajando.* P. ¿O sea que a veces ocurren tan

súbitamente que le es imposible a ustedes evitarlas? R. También ocurren súbitamente, a pesar de estar nosotros, *y no podemos evitarlas.* Nosotros a veces tenemos que aguardar que el suceso ocurra porque no podemos intervenir con las personas a menos que hayan cometido un delito en nuestra presencia . . . P. ¿Debido a este estado y este clima de violencia que ha prevalecido en ese sitio, no es cierto, comandante, que se ha obstaculizado la libre entrada allí, no solamente ya a la redacción del Imparcial sino a los mismos ocupantes del edificio? R. Sí señor . . . . . P. ¿Cree usted que ha cesado esa amenaza, ese peligro de atentado contra la propiedad y contra las personas empleadas en El Imparcial? R. *Actualmente no ha cesado."*

A preguntas en inglés del abogado de los demandados, el Comandante Soto declaró (preferimos no traducir) :

"Q. At any time during the strike, have you ever stated to any of your superiors, or anyone else, that the police were not able to take care of the strike situation at El Imparcial? A. Well, we have reinforced the police down there *but we cannot control everything.* Q. But you can't? A. We cannot control everything. Q. Are you controlling the strike situation now? A. *Now is under control.* Q. How long has the strike been under control? A. *I should say two or three days because of the fights between S.I.U. members and Teamsters.* Q. And those are minor skirmishes in the strike? A. Very close to the building. Q. Have you, or any of your officers, refused at any time during the strike to give police protection to anybody wanting to leave or enter the building? A. That is our duty, to give protection to both parties. Q. My question is have you or any other officer at any time during the strike refused to give protection? A. No, we have to protect any person who asks us for protection. Q. Absolutely? A. That is our duty. Q. Your duty, and you have been ready and willing and able during the strike to give what protection is necessary, is that correct? A. *Well, some times, so many persons ask for protection that that protection is not enough.* Q. Give me an example of that. A. For example, we have received information that many of the employees of El Imparcial have been threatened in their homes and on their way to their homes, when coming out or entering to the Imparcial, *so we can not give enough protection to those people.* Q. Obviously you can not send police to the homes of all the people involved. A. That is right. Q. At the present time the

newspaper is operating is it not? A. That is right. Q. And people are going in and out of the building? A. That is right. Q. And the newspaper is being printed? A. That is right. Q. And trucks come, pick up the newspaper and take it away? A. That is right. Q. And there are no incidents, there have been no incident at the picket line in the last, at least this week, is that correct? A. *In the picket line corner of Nolasco and Fernández Juncos Avenue there have occurred fights* between members of the S.I.U. and members of the Teamsters. Q. Those are matters you have been able to control? A. Yes, we control the situation now." A preguntas del tribunal el Comandante manifestó que normalmente habían alrededor de 93 a 100 policías en San Juan y Puerta de Tierra incluyendo a la oficialidad, y que actualmente había alrededor de 150 más traídos de distintas partes de la isla. Preguntado por el abogado de la peticionaria: "P. ¿Dígame, comandante, lo cierto es que todas estas agresiones de que usted ha tenido noticias han ocurrido no obstante la presencia de un gran número de policías allí? R. Han ocurrido. P. ¿Y que usted no puede evitar? R. *Y que no se han podido evitar.* P. ¿Esa es la verdad? R. Esa es la verdadera situación. P. ¿Y que actualmente hay peleas entre las dos uniones frente al Imparcial? R. *Ocurren peleas, ocurren todos los días peleas.* P. ¿El clima este que prevalecía antes es el que prevalece ahora? R. El clima allí es tenso, es decir, hay anormalidad, no está normal."

El empleado Pedro J. Burgos declaró que "El Imparcial" dejó de publicarse desde el 30 de mayo por motivos de la huelga de un grupo de empleados de la redacción en combinación con los Tronquistas, y reanudó la publicación con un número reducido de páginas en 13 de junio, 1960. Se refirió a las agresiones y amenazas a los empleados que seguían trabajando inclusive la destrucción de la comida que les era llevada de afuera, impidiéndose con dichas amenazas que muchos de los empleados fueran al trabajo, particularmente la mayoría de las mujeres; a la interrupción del libre acceso de empleados y clientes de la peticionaria, y a la destrucción de la tela metálica que protegía una ventana del edificio en momentos en que se rumoraba que los *"piquetes"* iban a meterse al periódico. Expresó que la circulación de "El Im-

parcial" bajó en más del 50 por ciento, había tenido una merma grande en anuncios y su publicación tardía había afectado adversamente la venta. La peticionaria ofreció, pero a indicación del tribunal desistió de presentar, prueba específica sobre las pérdidas ocurridas, por entender que sería acumulativa.

Obviamente, la evidencia en el récord va más allá de establecer una que otra alteración del orden surgida en el curso de una disputa obrera,—de ordinario conducida pacíficamente,—que la policía conjurara de una vez con su intervención o el arresto del infractor, producto de alguna conducta aislada o de un ánimo de momento solivantado. Los hechos indisputables son más graves de lo que estimó la Sala sentenciadora. Apreciados en todo lo que significan demuestran la existencia ya de un persistente *estado* de violencia y coacción mantenido con decidida voluntad por los demandados o varios de ellos como un medio calculado de imponerse en la disputa obrera y ganar la huelga aunque hubiera que derramar sangre. Los demandados o varios de los demandados persistían en mantener esa situación ilegal de violencia mediante la repetición, a veces por las mismas personas después de haber sido antes arrestadas, de agresiones, provocaciones personales e insultos, así como daños a la propiedad, a pesar de la continuada e inmediata presencia de los agentes del orden público en número sustancial y de sus oficiales, en claro desafío a la autoridad policíaca allí constituida y menosprecio del respeto que le era debido, la cual también era blanco directo de ataques (se le tiraron bombas "Molotov"), retos y provocaciones, inclusive el ponerle precio a la vida de un oficial. Por existir una disputa obrera y el legítimo derecho a establecer *"piquetes"* y anunciar la misma en las cercanías de la empresa de la peticionaria y ganar adeptos a su favor, la policía por sí misma no podía prohibir o impedir de antemano, como medida de prevención, la presencia allí de los demandados infractores de la ley, ni de cualquier

otra persona interesada en dicha disputa. Según declaró el Teniente Oliveras, la policía se veía imposibilitada de *prevenir* estos incidentes, en una situación ya anormal y de hecho tensa. No podía evitarlos. Como lo expresó el Comandante Soto, tenían que aguardar a que el suceso ocurriera porque no podían intervenir con las personas a menos que ya hubieran cometido un delito.

En las circunstancias que surgen de la prueba tal *estado* de violencia así mantenido por los demandados o por varios de ellos no se quebraba ni se disolvía con el arresto posterior y encausamiento de los infractores. En este sentido la protección de la policía no resulta ser adecuada. Como cabe observar, el *"piquete"* mismo constituye la línea sensible de donde igualmente puede surgir la actividad pacífica y permisible como el peligro de aquélla ilegal. No obstante la disposición en todo momento al cumplimiento de su deber que el récord demuestra, la prueba estableció satisfactoriamente que los funcionarios encargados del deber de proteger la propiedad de la peticionaria no podían proporcionar una *adecuada* protección. Los oficiales mismos de la policía señalaron situaciones de hecho en que a su juicio no les era posible la adecuada o necesaria protección contra la ocurrencia de incidentes y actos provocativos. Preguntado si conforme a su apreciación del *ambiente anormal* que existía en los alrededores de "El Imparcial" y su experiencia policíaca, la empresa podía desarrollar su negocio normalmente, ya hemos visto que el Comandante Soto expresó sin vacilación alguna que no, no creía que podía.(⁵)

A la fecha en que tenía lugar la vista del *injunction* preliminar el clima de violencia allí creado prevalecía aún, según declararan los propios oficiales, si bien en los últimos días

---

(⁵) El concepto *propiedad* según se usa en el apartado (*e*) del artículo 5 igual a la sección 7(*e*) de la Ley Norris-LaGuardia, y como se usó para similares fines en la Ley Clayton, 29 U.S.C.A. sec. 52, no queda limitado a la propiedad corpórea. Incluye su uso, así como el negocio o empresa de un individuo. Cf: *Knapp-Monarch Co.* v. *Anderson*, 7 F. Supp. 332, págs. 335–336; *TriPlex Shoe Co.* v. *Cantor*, 25 F. Supp. 996, pág. 998.

la huelga estaba bajo dominio, irónicamente, por las *peleas* entre miembros de la S.I.U. y Tronquistas. La Sala sentenciadora concluyó, en efecto, que los actos de violencia ocurridos últimamente no lo habían sido contra la peticionaria y sí entre miembros de la Unión de Tronquistas y la otra unión que intervino, pero este hecho no alteraba la situación presente ni dejaba igualmente de afectar a la peticionaria, ya que la violencia entre las uniones ocurría en la misma disputa obrera en que ella era parte y en el mismo sitio en que dicha disputa se desarrollaba.

■■ De ordinario, no es función de los tribunales la prohibición de actos criminales en evitación de que se cometan. Generalmente esta función reside en las esferas ejecutivas encargadas de mantener el orden público. Sin embargo, cuando en el radio de actividad protegido y privilegiado de una disputa obrera la presencia e intervención de los funcionarios encargados de mantener la paz pública no puede evitar que se altere el orden y se repitan actos de fuerza al extremo de persistir un clima de violencia e intimidación, la propia ley que protege ese radio de acción privilegiado reconoce y permite la intervención judicial de tipo preventivo a fin de asegurar que la disputa obrera se conduzca en la forma pacífica y ordenada que es deseable en esta clase de controversias, con plena seguridad y protección de los intereses en conflicto. En lo que respecta al requisito fijado en el apartado (*e*) del artículo 5 de la Ley 50, ante los hechos en el récord, el *injunction* preliminar no debió haberse negado.

Esta conclusión no está en pugna con las autoridades en que se apoyó la Sala sentenciadora, *Donnelly Garment Co.* v. *Dubinsky*, (C. A. 8) 154 F.2d 38; *Carter* v. *Harrin Motor*

Y véanse: *Truax* v. *Corrigan*, supra; *Duplex Co.* v. *Deering*, 254 U.S. 443, pág. 465; *American Steel Foundries* v. *Tri-City Council*, 257 U.S. 184, pág. 202; *Anotaciones* y casos citados en ellas en 27 A.L.R. pág. 418, 97 A.L.R. pág. 1346 y 106 A.L.R. pág. 370. Ludwig Teller, *Labor Disputes and Collective Bargaining*, Vol. 1 págs. 620 et seq. Que la ley no establece diferencia entre propiedad física y la intangible lo aclaró expresamente el Sr. LaGuardia. *Debates*, Congressional Record, Vol. 75 pág. 5480.

*Freight Lines*, (C. A. 5) 131 F.2d 557 y *Wilson & Co.* v. *Birl*, (C. A. 3) 105 F.2d 948, únicas decisiones que citan los recurridos en la breve argumentación de dos páginas hecha ante nos. En el caso de *Dubinsky*, ampliamente citado, se trataba de una acción de *injunction* tramitada en 1942 (55 F. Supp. 587, 589) en que se imputó a los demandados el haber conspirado entre ellos y con otras personas para obligar a la demandante Donnelly Garment por medio de violencia, fraude y amenazas de tales actos ilegales a reconocer a otra unión a la cual no pertenecían sus empleados como la unidad de negociación, y obligar a los empleados a pertenecer a esa otra unión. Se alegó que los funcionarios públicos cuyo deber era proteger a la demandante contra los actos ilegales amenazados no podían o no estaban dispuestos a dar adecuada protección. En primer lugar, la Corte de Apelaciones hace constar que el juez de distrito había concluido que no existía como cuestión de hecho tal conspiración o amenaza ilegal. Pero asumiendo la Corte de Apelaciones que ello no era así, entendió que los demandantes no habían probado el requisito de la sección 7 (*e*) de la Ley Norris-LaGuardia (5 (*e*) Ley 50). El juez de distrito concluyó que no se había demostrado que la policía de la ciudad de Kansas no podía o no iba a proporcionar adecuada protección contra cualquier violencia que "pudiera ocurrir" en la línea de *"piquetes"* o en otro sitio, "si y cuando ocurriera" una huelga en Donnelly, o de otra manera proteger a los empleados de la demandante que no estuvieran en simpatía con cualquier huelga llamada por la unión y añadió que la experiencia de huelgas en otras ciudades y el hecho que algunos o todos los huelguistas pudieran ser mujeres no justificaba la conclusión que la policía de la ciudad no podría ofrecer protección contra cualquier violencia que pudiera ocurrir. La Corte de Apelaciones convino en que de la evidencia en el récord ninguna otra conclusión pudo haberse hecho. Señaló que ninguna huelga había sido decretada contra la demandante ni actos de vio-

lencia cometidos contra ella y que en las huelgas de 1937 en que hubo violencia por la unión se había determinado, al concederse un *injunction*, que la policía podía, pero no había estado dispuesta a evitar la violencia allí ocurrida, y desde entonces habían ocurrido cambios en el gobierno local y una completa reorganización de la policía. Finalmente llama la atención la Corte de Apelaciones al hecho de que los demandantes no sentaron a declarar a los oficiales de la policía en apoyo de la alegación de que no podían o no estaban dispuestos a ofrecer protección contra cualesquier actos de violencia que razonablemente pudieran anticiparse, privando así a la corte inferior de la oportunidad de determinar, por el testimonio de dichos oficiales, en cuanto a la habilidad de éstos para cumplir con sus obligaciones. El récord, concluyó la Corte de Apelaciones, estaba huérfano de toda evidencia sobre la cual la corte inferior pudo haber hecho la conclusión jurisdiccional requerida, y de la ausencia de dicho testimonio infirió el hecho que, de haberse producido, el mismo hubiera sido adverso. Obviamente no comparan los hechos de este caso con la situación en el de autos. En *Carter*, la cuestión giró principalmente en torno al requisito sobre negociación o arreglo voluntario de la disputa contenido en la sección 8 de la Ley Norris-LaGuardia (artículo 6 Ley 50). Revocando el *injunction* concedido la Corte de Apelaciones concluyó que debió haberse denegado por falta del cumplimiento de dicho requisito. Opinó luego que la demandante tampoco había probado que las autoridades locales no ofrecían adecuada protección. A este efecto resumió la declaración de un oficial en el sentido de que podía proporcionar y proporcionó protección y que podía y pudo mantener el orden frente al negocio de la demandante. Esta evidencia, concluyó la Corte, desmentía la alegación y conclusión de que las autoridades locales o no podían o no darían protección. Y en el de *Birl*, una disputa por taller cerrado, se expresó que en general hubo poca violencia y no existía evidencia de que las tres o

cuatro ocasiones de violencia se hubieran confirmado, y que el *"piquete"* en la planta de la demandante se estaba llevando a cabo bajo el dominio y supervisión de la policía y ésta aparentaba haber proporcionado protección contra daños a la propiedad física. En *Green* v. *Obergfell*, (C.A.D.C.) 121 F.2d 46, *cert. denegado*, 314 U.S. 637 en donde también surge el punto de la protección policíaca, al revocar el *injunction* decretado la Corte de Apelaciones apunta que la prueba no demostró tal falta de protección o que los actos ilegales no se habían ya realmente suprimido y los infractores castigados mucho antes del juicio del caso; que de hecho el récord demostraba que el oficial de la policía declaró sobre sucesos ocurridos en 1935, la demanda original se había presentado en 1937 y la vista celebrada en 1939.

En la interpretación de la legislación federal y de las leyes estatales que en mayor o menor extensión han desterrado el *injunction* del campo obrero-patronal, la violencia en sí en el curso de una disputa obrera y los métodos ilegales o abusivos de coacción jamás se han considerado fuera del alcance de este tradicional remedio equitativo que protege a una parte particularmente afectada por actos criminales contra el daño irreparable, no obstante la sanción de la ley penal a tales actos. En este respecto los tribunales no han discrepado. Así fue bajo la Ley Clayton de 1914 que por sus propios términos permitía el *injunction* sólo cuando fuera necesario para evitar daño irreparable a la propiedad o al derecho de propiedad, para lo cual no hubiera remedio adecuado en ley, considerándose de ordinario por los tribunales que en situaciones de disputas obreras la violencia o los métodos ilegales o abusivos de coacción producían tal estado de daños. Así lo ha sido bajo la Ley Norris de 1932 que expresamente excluye los actos ilegales o el fraude de la actividad inmune a la concesión de *injunctions*.

■ Sin embargo, bajo la Ley Norris-LaGuardia y la adopción que hicimos de la misma a través de la Ley 50 de

1947, no es suficiente la violencia y los actos ilegales o abusivos de coacción para que proceda el *injunction* en evitación de daño irreparable, como bastaba en el derecho anterior a la adopción de dicho estatuto, y lo es aún en algunas jurisdicciones estatales donde al adoptarse legislación similar no se incluyó el requisito de la sección 7 (e) [artículo 5 (*e*)]. Es preciso determinar que los funcionarios públicos que tienen el deber de proteger la propiedad de la parte solicitante del remedio no pueden o no están dispuestos a proporcionar la protección adecuada.(6) Por otra parte, no basta con que la policía proporcione protección, sino que debe ser una protección *adecuada*. El concepto de "adecuada", que aquí tiene un alcance dual de hecho y de derecho no es una mera caracterización de más o menos contenido. A tenor de los precedentes judiciales que ya eran conocidos, hubo de usarse por el Congreso con miras al sentido constitucional del debido procedimiento. Bajo el principio sentado en *Truax* v. *Corrigan* y en otras decisiones a que aluden los debates congresionales de la Ley Norris, la denegación de un *injunction* en

---

(6) Esta disposición, y la sección 8 que impone la obligación previa de negociar la disputa, han sido consideradas como las más drásticas y novedosas adiciones introducidas en la legislación contra el *injunction* obrero. Refiriéndose a la sección 7 (*e*) expresó el Representante O'Connor que ciertamente la corte [federal] no debía ejercer poder policíaco si las autoridades constituidas estaban dispuestas y podían cumplir tal función. Se ha resuelto que los funcionarios a que se refiere dicha disposición son las autoridades policíacas locales de la ciudad, del condado o del estado donde ocurre la disputa. El Representante Beck comentó, refiriéndose a la misma, que tal encuesta sería una afrenta a las autoridades del estado. *Congressional Record*, Vol. 75, págs. 5464, 5472. A pesar de que la sección 7 (*e*) responde, junto a las demás disposiciones de la Ley Norris, a una actitud congresional decidida a limitar drásticamente la jurisdicción de las cortes federales para conceder *injunctions* en estos casos, la misma cubre de paso el problema siempre delicado de la relación debida entre la soberanía federal y la estatal, evitándose hasta el extremo la intervención federal en funciones pertenecientes primordialmente al *estado como* es la conservación y establecimiento de la paz pública. Como apuntamos, no todos los estados que aprobaron legislación siguiendo sustancialmente la Ley Norris adoptaron la sección 7 (*e*) y, con excepción de los casos de Nueva York, apenas aparece dicha disposición discutida en las decisiones estatales.

una disputa obrera en que una parte sufre daños irreparables en circunstancias en que la protección ofrecida por la policía contra los actos de fraude o violencia no resulta eficaz, conduciría en última instancia a una privación de la propiedad sin el debido procedimiento de ley. De ahí el sentido fundamental de la calificación de *adecuada* de la protección policíaca.

▪▪ Ante este concepto apreciativo que toca la esfera de las garantías constitucionales no siempre es posible resolver el problema en términos de una fórmula cuantitativa de protección ofrecida. Se precisa de una evaluación razonadamente balanceada de cada situación a la luz de los hechos y circunstncias en cada caso en particular y de los valores envueltos. Una crecida fuerza policíaca podría no dar la adecuada protección frente a determinados factores. Junto a los hechos ostensibles en la conducta de personas o grupos a veces coexisten peligrosamente elementos subjetivos o designios y propósitos dañinos que a la policía, no importa su fuerza, no siempre le sería dable evitar que se materialicen. Tal es la peculiaridad, y la dificultad a la vez, que ofrece el *"piquete"* cuando no se está en plan de orden, en donde es viable que coexistan sin el preciso deslinde la expresión inviolable de la libertad de palabra o el ejercicio de un legítimo derecho obrero-patronal, y el acto fraudulento o de violencia. En tales circunstancias, cuando se desata la violencia, surge el peligro de que una protección eficaz para reprimir efectivamente lo ilegal redunde en la supresión por igual de la expresión permisible. De hecho, han habido precedentes. Cf: *Drivers Union* v. *Meadowmoor Co.*, 312 U.S. 287, pág. 294, y *Anotación*, 132 A.L.R. 1218. Siempre sería preferible que la actividad pacífica no sea suprimida si aquélla ilegal puede impedirse.

El que se proporcione o no por la policía la protección adecuada presenta en última instancia una cuestión de derecho en tanto ello impide o permite, en ley, la concesión de

un *injunction.*(⁷)  Al resolverla, estamos en libertad de hacer nuestro propio aquilatamiento de los hechos indisputables en el récord, y según los mismos, concluimos como cuestión de derecho que la protección proporcionada por la policía no era adecuada.  La peticionaria tiene derecho a protección contra toda conducta de los demandados que, aun dentro de la anormalidad que produzca un estado de huelga, le impida funcionar su negocio ordinariamente sin ataques personales, amenazas e intimidación a sus empleados no en huelga, que deseaban trabajar y se abstenían de hacerlo por razón de dichos ataques y amenazas; sin daño a su propiedad física ni obstáculos al libre acceso a sus dependencias; libre

---

(⁷) Rara vez, hasta donde hemos podido encontrar, se ha tratado de definir *a priori* el alcance legal del apartado (e) del artículo 5 (sección 7(e) Norris).  Una de esas pocas expresiones aparece en *Cupples Co.* v. *American Federation of Labor*, 20 F. Supp. 894 (D. C. Mo.) seguido con aprobación en *General Electric Co.* v. *Gojack*, 68 F. Supp. 686 (D. C. Ind.), citados por la recurrente en su alegato.  Se dijo en el caso de *Cupples* en donde a base de la prueba se denegó el *injunction:* "¿Qué hechos alegados o qué prueba sería suficiente para establecer el hecho que los funcionarios locales no pueden o no están dispuestos a ofrecer protección adecuada?  Por supuesto, si hubiera una declaración precisa de parte de esos funcionarios de no estar dispuestos a actuar eso sería suficiente a tal respecto.  Igualmente, si, después de una eficaz cooperación de los funcionarios locales resulta derramamiento de sangre o violencia a pesar de esa cooperación y auxilio, la prueba de tales hechos sería suficiente.  Pero ciertamente el Congreso no intentó que esta corte esperara la declaración de parte de los funcionarios locales de la renuencia de ellos a cumplir sus deberes.  Más ciertamente no intentó que esta corte se mantuviera en la espectativa hasta que efectivamente ocurriera derramamiento de sangre, lucha, y violencia antes de prestar su ayuda para entonces meramente evitar una repetición de lo que el Congreso evidentemente intentó debía evitarse en el primer momento."  En *Carter Const. Co.* v. *Nischwitz*, 111 F.2d 971 (C. A. 7) se dijo que la protección que el estatuto concebía era aquélla que, a la luz de los hechos allí envueltos, hubiera permitido a aquellos demandantes continuar con el trabajo en las obras.  Véase comentario de Frankfurter y Greene a la sección 7(e) del entonces proyecto de ley Norris en *The Labor Injunction*, págs. 221–222 y Apéndice IX, pág. 279.

En Rothenberg *on Labor Relations*, págs. 208–209 se comenta, y en efecto así es, que las decisiones no demuestran una norma en particular sobre el *quantum* de prueba bajo este apartado, o hasta qué grado debe haber falta de protección.  La situación parece resolverse a la luz de los hechos y circunstancias presentes en cada caso en particular.

de intimidación y de insultos, y del estado de violencia que se creó en esta disputa obrera. (8)

■■ No resultando adecuada la protección policíaca en este caso, procede que se dicte el *injunction* preliminar de concurrir los demás requisitos dispuestos en el artículo 5. Los hechos indisputables en el récord, considerados a la luz de la doctrina aplicable nos permiten concluir en adición: (*a*) que se cometieron actos de violencia que aún no habían cesado al momento de celebrarse la vista ante la Sala sentenciadora y, en ausencia de indicación en contrario, se seguirán cometiendo a menos que se impidan, Cf: *Tri-Plex Shoe Co.* v. *Cantor*, 25 F. Supp. 996; *Local 167* v. *United States*, 291 U. S. 293, págs. 297–298; *Levy and Devaney, Inc.* v. *International Pocketbook Workers, etc.*, 158 Atl. 795, pág. 796; (*b*) que habrán de resultar daños sustanciales e irreparables a la propiedad física (9) de la peticionaria; (*c*) que resultaría en mayor perjuicio para la peticionaria negarle el *injunction* preliminar que para los demandados el concederse. En efecto, los demandados no pueden invocar un balance de conveniencia a su favor en que se les permita realizar actos en contravención de la ley; (*d*) que la peticionaria no tiene ningún otro recurso adecuado en derecho. El arresto y even-

---

(8) Cf: *Youngdahl* v. *Rainfair, Inc.*, 355 U.S. 131; *Hotel Employees* v. *Sax Enterprises*, 358 U.S. 270; *United Automobile Aircraft, etc. Workers of America* v. *Wisconsin Board*, 351 U.S. 266; *Building Service Union* v. *Gazzam*, 339 U.S. 532; *International Union, etc.* v. *Wisconsin Board*, 336 U.S. 245; *Allen-Bradley Local* v. *Board*, 315 U.S. 740; *Hotel Employees' Local* v. *Board*, 315 U.S. 437; *Drivers Union* v. *Meadowmoor Co.*, supra, pero compárese en parte con *Youngdahl* v. *Rainfair*, supra; *Local No. 332, etc.* v. *Grand Trunk Western Railroad Co.*, 239 F.2d 851 (C. A. 6); *Southern Lines* v. *Amalgamated Ass'n, etc.*, 38 So.2d 765; *United States Pipe & Foundry Co.* v. *United Steelworkers, etc.*, 157 A.2d 542; *Busch Jewelry Co.* v. *United Retail Employees Union, etc.*, 22 N.E.2d 320, 124 A.L.R. 744; *Steiner* v. *Long Beach Local No. 128, etc.*, 123 P.2d 20.

(9) La Ley Norris sólo usa el término "propiedad". Aparte de que nada hay en el historial legislativo de la Ley 50 que indique en este sentido un propósito del legislador distinto al de la Ley Norris, bajo bien sentados principios el término "propiedad física" incluye, a los fines de este estatuto, el negocio o empresa de una persona.

tual proceso criminal de los infractores no provee en las circunstancias de este caso tal remedio.

*En virtud de todo lo anteriormente expuesto se revoca la resolución recurrida y se devuelve el caso a la Sala sentenciadora para que de acuerdo con las anteriores conclusiones: (a) dicte el injunction preliminar contra los demandados o contra aquellos demandados que proceda a tenor de la prueba en el récord, en aquellos términos que sean justos y apropiados para garantizar los derechos de las partes en esta disputa obrera a la luz de todas las circunstancias envueltas, y de conformidad con lo dispuesto en el artículo 2 y en los artículos 4, 5(a) y 7 de la Ley 50; y (b) para que se continúen los procedimientos en lo que respecta al injunction permanente.*

Opinión disidente del Juez Asociado señor Serrano Geyls, en la cual concurren los Jueces Asociados señores Pérez Pimentel y Blanco Lugo.

Debo, con toda deferencia, disentir del criterio del Tribunal. Estimo que las conclusiones sobre los hechos del juez sentenciador están ampliamente sostenidas por la prueba y que tanto de hecho como legalmente, la Policía brindó a la peticionaria "la protección adecuada" que menciona la Ley Núm. 50 de 4 de agosto de 1947 (*Leyes*, pág. 277; 29 L.P.R.A. secs. 101–109). Discrepo igualmente de varias interpretaciones de orden legal y constitucional que constan en la opinión,[1] pero desafortunadamente las limitaciones de tiempo me impiden hacer un análisis de ese aspecto. Por lo tanto, limitaré la exposición al primer problema.

---

[1] Debo señalar, sin embargo, que me parece de muy dudosa validez, y sobre todo absolutamente innecesaria, la afirmación que tacha de inconstitucional a una ley que prohiba la concesión de *injunctions* en disputas obreras cuando la protección de la policía no resulte eficaz. Ese problema no está ante este Tribunal en el presente caso y anticipar un criterio sobre un asunto tan delicado es, a mi juicio, apartarse de la fundamental norma, nacida de la doctrina de la separación de los poderes, que prohibe a un tribunal anticiparse a decidir una cuestión de derecho constitucional antes de que sea necesario hacerlo. *Ashwander* v. *Tennessee*, 297 U.S. 288, 346 (1936); *E. L. A.* v. *Aguayo*, 80 D.P.R. 552, 595–600 (1958).

Antes de entrar de lleno en esa discusión, es indispensable situar la controversia, aunque sea por vía de síntesis, en su adecuado marco históricolegal. Es sabido que los movimientos sindicales de los Estados Unidos tropezaron en sus comienzos con enormes dificultades. Esa dolorosa historia ha sido narrada admirablemente en varias obras y no es éste el sitio para repetirla. Basta indicar que en el campo del derecho, las uniones tuvieron que enfrentarse a normas tomadas de las doctrinas penales, de monopolios y de daños y perjuicios, las cuales se usaron con notable eficacia para limitar indebidamente sus actividades. De las últimas nació la práctica judicial de medir los actos gremiales de acuerdo con la "legalidad" de sus objetivos y sus métodos. El *injunction* se convirtió en el instrumento procesal favorito para destruir o debilitar las uniones, reservándose los jueces el absoluto poder de concederlo o negarlo de acuerdo con su particular criterio sobre la deseabilidad de la actividad obrera. Va sin decirse que ese criterio, salvo contadas ocasiones, fue siempre desfavorable a los trabajadores.

Este abuso de la doctrina de "objetivos", junto a varias prácticas procesales indebidas,([2]) movieron a los trabajadores a protestar vigorosamente ante el Congreso y a solicitar remedios que restringieran la jurisdicción de los tribunales federales, principales culpables de estas prácticas, para dictar órdenes de *injunction*. Ese clamor culminó en 1914 con la aprobación de la Ley Clayton, la cual orgullosamente proclamó que "el trabajo de un ser humano no es un artículo de comercio", enumeró los derechos básicos de los trabajadores, y prohibió a las cortes federales conceder *in*

([2]) La historia de estas actuaciones judiciales ha sido narrada impresionantemente en la clásica obra de Félix Frankfurter y Nathan Greene, *The Labor Injunction* (1930), donde también se encuentra una amplia discusión del proyecto del Senado que finalmente se convirtió en la Ley Norris-LaGuardia (págs. 205–228). Relaciones explicativas de los abusos de procedimiento se hallan en Handler, *Cases and Materials on Labor Law* (1944) págs. 141–144; *Truax* v. *Corrigan*, 257 U.S. 312 (1921) opinión disidente del Juez Brandeis; *Great Northern Ry. Co.* v. *Brosseau*, 286 Fed. 414 (N. D. 1923).

*junctions* en disputas obreras salvo para impedir daños irreparables a la propiedad. Pero la "Magna Carta de la libertad industrial" como jubilosamente la llamó Samuel Gompers, no produjo los resultados anhelados. Muy pronto el Tribunal Supremo federal redujo la Ley Clayton a escombros mediante interpretaciones extremadamente restrictivas.(³) Luego de esas interpretaciones, las cortes federales continuaron dictando *injunctions* contra las actividades sindicales basados en las predilecciones de los jueces sobre la conveniencia social y económica de esa conducta. Las prácticas procesales tampoco cambiaron significativamente.

Para enfrentarse a esos problemas, el Congreso aprobó la Ley Norris-La Guardia en 1932.(⁴) Esta ley "constituye un ataque en tres frentes contra el derecho laboral y su administración creados por los jueces. Primero, la ley rechazó el *injunction* como un remedio en las disputas obreras. Segundo, declaró que los tribunales federales no constituyen un organismo apropiado para formular la política laboral substantiva. Tercero, repudió el *common law* federal de relaciones del trabajo y estableció una política de neutralidad en las disputas obreras como un medio de fomentar el crecimiento del trabajo organizado." Winter, *Labor Injunctions and Judge-Made Labor Law*: *The Contemporary Role of Norris-La Guardia*, 70 Yale L. J. 70, 73 (1960). Esos objetivos y la ley que los encarna mantienen hoy día su pleno vigor excepto en lo que respecta a algunas modificaciones hechas expresamente en leyes federales posteriores. *Order of Railroad Telegraphers* v. *Chicago & North Western Rail-*

---

(³) Véanse *Hitchman Coal & Coke Co.* v. *Mitchell*, 245 U.S. 229 (1917); *Duplex Printing Press Co.* v. *Deering*, 254 U.S. 443 (1921); *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U.S. 184 (1921).

(⁴) "La historia legislativa de la ley demuestra que el Congreso tuvo el propósito de extender aún más las prohibiciones de la Ley Clayton que limitaban el ejercicio de la jurisdicción de las cortes federales y de eliminar los resultados de las interpretaciones judiciales de esa ley." *New Negro Alliance* v. *Sanitary Grocery Co.*, 303 U.S. 552, 562 (1938); *Order of Railroad Telegraphers* v. *Chicago & N. W. R. Co.*, 362 U.S. 330, 336 (1960).

*way Co.*, supra, pág. 335; *Marine Cooks & Stewards, A.F.L.*
v. *Panama Steamship Co., Ltd.*, 362 U.S. 365, 369 (1960);
*Accomodation of the Norris-La Guardia Act to other Federal
Statutes*, 72 Harv. L. Rev. 354 (1958); Winter, *ob. cit.*,
supra, págs. 76–102.

La enumeración de los derechos de los trabajadores y las
innovaciones procesales que contiene la ley constan de la
opinión del Tribunal en este caso y es innecesario repetirlas.
Conviene aclarar, sin embargo, que esos derechos y esas inno-
vaciones recibieron y continúan recibiendo de parte del Tri-
bunal Supremo y las demás cortes federales, una interpre-
tación en estricto cumplimiento de los propósitos legislativos
y que así se ha impedido que esos tribunales intervengan
indebidamente en numerosas disputas laborales. *Marine
Cooks & Stewards, A.F.L.* v. *Panama Steamship Co., Ltd.*,
supra, pág. 369.

En 1947 la Asamblea Legislativa de Puerto Rico aprobó
una ley que es prácticamente una copia de la Ley Norris-La
Guardia. 17 Rev. Jur. U. P. R. 272 (1948). La ley no
contiene una exposición de los motivos que tuvo el legislador
al aprobarla, pero el uso *verbatim* de las palabras usadas en
la Ley Norris-La Guardia es prueba concluyente de que se
intentaba lograr los mismos propósitos. Además, en los
pocos sitios en que la ley nuestra introduce cambios, el pro-
pósito evidente es el de hacer aun más clara la política pública
restrictiva del *injunction* en disputas obreras.([5]) No tiene,
pues, importancia alguna, aun cuando fuera correcto, que
las circunstancias históricas del Puerto Rico de 1947 fueran

([5]) Véanse como ejemplos: (*a*) la inclusión de la palabra "todas"
en la última línea del primer párrafo del art. 5 (29 L.P.R.A. sec. 105,
29 U.S.C.A. sec. 107) para evitar la interpretación de que basta cumplir
con algunos requisitos de los allí enumerados; (*b*) el uso en el apartado
(a) de la misma sección de las palabras "actos de fraude y violencia" en
lugar de "actos ilegales" para hacer más clara la restricción; (*c*) la adición
de la palabra "física" al término "propiedad" en la misma sección, para
evitar se incluyeran los daños normales que producen las huelgas y los
piquetes.

distintas de las de los Estados Unidos de 1932. Al aprobar la ley *anti-injunction* de 1947, la Ley de Relaciones del Trabajo de 1945 y 1946 (29 L.P.R.A. secs. 61–76), y las demás leyes protectoras de los derechos de los trabajadores, nuestra Asamblea Legislativa evidenció una encomiable anticipación de futuros conflictos, e hizo patente el propósito de que el ambicioso programa de industrialización que se iniciaba en los mismos años, no se iba a caracterizar por las prácticas abusivas contra el trabajador individual y las uniones que habían definido la industrialización norteamericana de fines del Siglo 19 y principios del 20.

Aclarado el marco históricolegal, pasemos ahora a los hechos. Es indispensable recordar que en esta clase de controversias, la búsqueda debe orientarse exclusivamente hacia los actos específicos de "fraude y violencia" cometidos por los demandados. Unicamente contra esos actos es que la ley autoriza las órdenes prohibitorias. No obstante, la opinión del Tribunal combina en la misma relación: 1. actos perfectamente legales y protegidos por la Constitución con actos de "fraude y violencia"; 2. actos realizados por los demandos con actos realizados por otras personas y aun por personas desconocidas; 3. actos realizados contra la peticionaria con actos realizados contra otras personas; y 4. conclusiones y generalizaciones de los testigos sobre la prueba con testimonio sobre actos específicos. Esa exposición ayuda muy poco a fijar responsabilidades y resulta muy peligrosa en un pleito que puede desembocar en procedimientos sumarios de desacato, y en un área de acción llena de intensidades pasionales e intervenida por numerosas provisiones de ley y de constitución, federales y estatales.

Veamos en primer término las fechas. La prueba demuestra que la huelga comenzó el 24 de mayo de 1960, la demanda se interpuso el 9 de junio, las vistas se celebraron los días 15 y 16 de junio, la sentencia se dictó al día siguiente y la apelación se interpuso el día 28 de junio.

La peticionaria enumeró en sus alegaciones catorce actos específicos de violencia cometidos por varios de los demandados. Dos de ellos se dice ocurrieron el día 25 de mayo, dos el día 26, dos el día 27, tres el día 29, uno el día 30, uno el día 31, uno el día 3 de junio, uno el día 4 y uno el día 6. Incluyó, además, varias alegaciones generales sobre violencia, insultos, amenazas e intimidación.

Cuatro personas testificaron en las vistas: tres oficiales de la Policía y un empleado de la peticionaria.

El Capitán de la Policía Luis M. Pérez estuvo en el sitio de los sucesos desde el día 26 de mayo. Tenía un turno de ocho horas diarias pero a veces estaba de doce a dieciséis horas.(6) El día 26 encontró un solo piquete compuesto de diez a doce personas colocadas a varios pies de la entrada principal; luego en otras ocasiones se formaba otro piquete en la otra calle compuesto del mismo número. Identificó a Gil, Cruz, Ojeda, Trías, Amador, Virella, Montoya, Arguinsoni, Oliveras, Cruz Roque, Feliciano, Rodríguez Benítez, Percy y Chávez como personas que vio en los piquetes. La conducta de los piquetes era ésta: "Había momentos de pasividad, pero había momentos de nerviosidad y momentos que teníamos que ponerlos en orden, llamarles la atención en ocasiones como tales a la entrada, a la salida, más bien en la hora de mediodía, por las tardes a la salida, en casos específicos." En cuanto a los piquetes nocturnos: "había días que no había un piquete, una persona o dos o algunos descansando en sillas, digo a altas horas de la madrugada cuando yo llegaba, pero había días que habían piquetes ya formados."

Desde el 26 de mayo hasta el día de su declaración— 15 de junio—y en todas las horas que allí estuvo, el Capitán Pérez fue testigo de sólo tres actos de agresión y uno de insultos, todos ocurridos "al principio": 1. El día 26 de mayo entre once y doce de la mañana, Humberto Trías agarró por los pies a Ismael Hernández, un empleado de la peticionaria,

---

(6) Inicialmente su turno comenzaba a las seis A. M., luego (no sabemos exactamente cuándo) comenzaba a las 4 A. M.

quien cayó, se levantó y corrió y entonces Cruz Roque "se le abalanzó encima"; Pérez los separó y procedió al arresto. Hernández recibió golpes leves; 2. Un día ("no recuerdo la fecha") Humberto Trías, frente a la entrada principal, le "tiró una patada" a Joaquín Martínez Rousset, otro empleado de la peticionaria, luego de tratar de hablar con él y éste negarse, y lo alcanzó levemente; 3. José Gil de Lamadrid atacó (no dice el día) con el puño a Luis Cortright, otro empleado de la peticionaria, y le produjo "una pequeña peladura" en la mejilla; Pérez intervino pero Cortright no quiso que se procediera contra el agresor; 4. Un "joven universitario" de nombre Jim Landrot que "en una noche" y desde la línea de piquete pronunció las siguientes palabras: "Ayuso, asesino, cobarde, mataste a Aguilita", "Sal de ahí, sal para fuera". No tiene conocimiento de acto alguno de atentado o destrucción de la propiedad. En cuanto a la vigilancia policíaca, Pérez explicó que la Policía se colocaba en distintos sitios cerca del edificio y que llegaron a tener 108 agentes, "por lo menos". Desde "el lunes anterior" había comenzado el piquete de la S.I.U., primero compuesto de diez personas y en una ocasión llegó a tener cincuenta, pero siempre en un número similar al de los Tronquistas. ¿Cuál era la situación al declarar el Capitán Pérez? Había "dos piquetes distintos, uno en Nolasco Rubio y otro en el Muelle 3 de San Juan, Fernández Juncos, y en Nolasco hay cuatro de un lado y cuatro del otro lado. Cuando lo dejé en el otro lado había tres y tres, no sé en este momento." Para esos piquetes que en total suman catorce personas, había asignados cincuenta y dos policías. La gente entra y sale del edificio de El Imparcial sin que nadie los pare; el periódico está imprimiéndose; los camiones llegan al edificio y salen con los periódicos; la Policía da protección a los vehículos que reparten el periódico y en algunas ocasiones acompañan a algunos empleados "cuando lo requieren". Opina que el clima que prevalece en los alrededores del edificio "no es normal".

*Alejandro Oliveras*

Es Teniente de la Policía Estatal y estuvo en el sitio de los sucesos por lo menos desde el día 26 de mayo. Describe específicamente los siguientes actos de violencia: 1. En "uno de los días de mayo" arrestó a Gil de Lamadrid por haber atacado con los puños a un empleado del periódico, "un tal Castillo"; 2. simultáneamente Trías atacó a otro empleado, cuyo nombre no recuerda; 3. Trías le lanzó un puntapié a un fotógrafo, de nombre Sostre, y le alcanzó la cámara con la punta del pie; 4. Trías le lanzó una piedra como de diez libras al automóvil de Ayuso y le hundió la capota. Insultos: 1. Trías llamaba a Ayuso y a los demás empleados "rompehuelgas, asesinos y otras por el estilo;" 2. Ramón Díaz Cruz "profería insultos". Actuaciones contra la policía: 1. Cuando Oliveras acompañaba a dos personas a entrar al edificio, Trías le gritó que él (Oliveras) era "el rompehuelgas Núm. 1 de El Imparcial"; 2. Trías le gritaba "rompehuelgas" a la Policía y acusaba a los oficiales de "estar cogiendo dinero de El Imparcial"; 3. Angel Luis Vélez "ofreció $1,000 por el que me matara"—no recuerda el día ni la hora, la frase fue oida "por un policía", recuerda "la persona que la presenció" pero no las personas que estaban presentes; 4. "un día" le lanzaron desde el público tres bombas Molotov a la Policía, sin que pudiera determinarse quién las lanzó. Habla, además, de exhortaciones hechas por Trías y Lamadrid al público para que tomara la "acción necesaria" contra los rompehuelgas y la Policía. Identificó a Chavez, Trías, Gil de Lamadrid, Ojeda, Lander, Díaz Cruz, Vélez y Amador como personas que vio en los piquetes. Añade que hubo cuarenta o cincuenta policías, "otras veces más". El pueblo se reunía y "hubo veces que hubo más de quinientas personas detrás de los piquetes de los Tronquistas", y en el otro extremo "la cuarta o quinta parte", pero de la masa del público no se podía identificar quiénes eran marinos y quiénes eran Tronquistas. La Policía tomó la siguiente acción (no dice cuándo exactamente): 1. separó los relevos de los piquetes;

2. estableció una distancia de 35 a 40 pies entre los piquetes de las dos uniones; 3. limitó los piquetes a diez de una parte y diez de otra; 4. desalojó al público del sitio (esto sucedió con motivo de haberse lanzado las bombas Molotov a la Policía desde el público).

En cuanto a la situación general, la describe como "tan dispersa que nosotros humanamente no podíamos dar la protección que necesariamente se merecía el sitio y las personas allí" y añade que ésa es la situación que prevalece "todavía". Sin embargo, esta última apreciación del testigo Oliveras queda totalmente destruida por el hecho de que él declaró que por "ser un hombre enfermo", hacía por lo menos cinco días(⁷) que no iba al sitio de los sucesos. Esa circunstancia, además, comprueba que los actos específicos de violencia por él descritos habían también ocurrido en una fecha anterior a esos cinco días.

### Benigno Soto

Es Comandante de la Policía Estatal. Comenzó a intervenir en la huelga desde el 24 de mayo. Conoce los sucesos por información, "muy pocos de conocimiento propio . . . la información me la daba la Policía y el Capitán Luis M. Pérez". No menciona un solo caso específico de violencia. Dice los Tronquistas comenzaron a "piquetear" el día 24 de mayo y la S.I.U. del 6 al 7 de junio. No ha escuchado insultos en el sitio. Se mantienen tres turnos de cincuenta policías cada uno. Se ordenó a las dos uniones reducir los piquetes a diez personas cada uno. Se retiró al público a cincuenta yardas del sitio. El periódico está funcionando, la gente entra y sale, los camiones toman los periódicos y se los llevan. No ha habido incidentes en la última semana

---

(⁷) Declarando el día 16 de junio (jueves) Oliveras dijo que "desde el sábado pasado para acá no estoy en la línea de piquetes, por la condición debo aclarar, por la condición que a pesar de ser yo el comandante del distrito de San Juan, mi condición física me impide que siguiera trabajando en ese sitio, porque yo soy un hombre que estoy enfermo hace ya algún tiempo, y mi condición física no me permite echarme a cuestas ese trabajo que es tan enorme."

excepto peleas en la esquina de Nolasco y Fernández Juncos entre miembros de las dos uniones pero esa situación la controla la Policía. Considera que el ambiente está "alterado", que no es "normal", que hay "tensión", pero que la Policía "controla la situación".

*Pedro J. Burgos*

Es redactor del periódico El Imparcial. Menciona específicamente un solo incidente de violencia: el sábado 4 de junio, de nueve a diez de la noche, uno de los piquetes con un madero rompió la tela metálica que cubre una de las ventanas del primer piso. Añade, además, que "un abogado" que iba a llevar un edicto fue "interceptado". No menciona específicamente ningún otro incidente. En cuanto a la situación prevaleciente, todo lo que dice es que "todavía hay empleados que tienen temor de entrar libremente al periódico", y que la "policía protege la entrada y salida a los empleados, a la salida del periódico". Declara que el periódico dejó de publicarse el día 30 de mayo por "motivo de un movimiento huelgario de un grupo de empleados de la redacción de El Imparcial en combinación con los Tronquistas", y que reanudó su publicación el lunes 13 de junio. Ha bajado el número de páginas y de anuncios y la circulación del periódico.

Esa es, en síntesis, la prueba específica ofrecida. Además de ella, los testigos se refirieron a otros "incidentes", "amenazas", "insultos" y "provocaciones" de los cuales se alegaba tenían conocimiento, pero sin que en modo alguno señalasen la mínima circunstancia que permitiera identificarlos y mucho menos evaluarlos. Es evidente que esta clase de prueba no puede tener peso alguno en pleitos de esta índole. La repetida referencia de la ley a "actos de fraude y violencia" y a "actos específicos" ([8]) comprueba que se quiso impedir precisamente la concesión de *injunctions* a base de alegaciones y prueba de carácter general. Esa había sido

([8]) Arts. 4, 5 y 7.

una de las peores prácticas de los tribunales federales contra la cual se había protestado vigorosamente. Frankfurter y Greene, *ob. cit.* supra, págs. 60-81. Las siguientes palabras escritas por el Tribunal Supremo de Wisconsin hace más de medio siglo, con relación a las peticiones de *injunction* en disputas obreras, tienen, sin duda, aun más pertinencia en cuanto a la prueba:

"Una querella en un pleito de *injunction* debe ser detallada, segura y específica, ofreciendo hechos y circunstancias, incluyendo la fecha y sitio de cada acto que se alegue, el nombre de la persona coaccionada, la manera como se le coaccionó, y la manera y extensión en que afectó o impidió el derecho del patrono a conducir su negocio legalmente." *Badger Brass Mfg. Co.* v. *Daly,* 119 N.W. 328, 330 (1909).

Tampoco ayudan gran cosa en este pleito las caracterizaciones de la situación que hicieron los testigos. Cierto es que esos criterios, especialmente los de los funcionarios públicos, son de utilidad para medir la situación adecuadamente. Pero en este pleito la caracterización de no ser "normal" el ambiente tiene contornos muy indefinidos y los hechos específicos probados le quitan toda su autoridad. Después de todo, una orden judicial no puede fundarse en un adjetivo.

En suma, la prueba específica demuestra que durante los primeros días de la actividad huelgaria ocurrieron varios actos de violencia, cometidos por las personas que ya hemos mencionado. Se trata en todos los casos de agresiones leves o de daños de poca importancia contra la propiedad. Junto a esos actos se profirieron frases insultantes y en dos ocasiones se exhortó al público a actuar contra los rompehuelgas y la Policía. Los mencionados actos registraron mayor frecuencia en los últimos días del mes de mayo y los primeros días del mes de junio. Tan pronto, sin embargo, como la Policía tomó las medidas obviamente necesarias en la situación (y que estoy convencido debió haber utilizado antes) cesaron los actos de violencia. Es muy significativo a este respecto que los catorce actos específicos de violencia men-

cionados por la peticionaria en su demanda, (de ellos sólo pudo probar seis y varios en circunstancias diferentes de las alegadas) ocurrieron, según se alega, entre el 26 de mayo y el 6 de junio y de ellos diez tuvieron lugar entre el 25 y el 31 de mayo. No hay alegación alguna sobre actos específicos de violencia cometidos después del día 6 de junio, y no hay prueba alguna sobre dichos actos con posterioridad al 4 de junio.

Por lo tanto, para la fecha en que se interpuso la demanda, 9 de junio, para las fechas de las vistas, 15 y 16 de junio, y desde hacía varios días, la situación era la siguiente: los piquetes estaban limitados a diez personas por cada unión y frecuentemente había en ellos sólo tres o cuatro personas; los dos grupos estaban separados por una distancia de 35 a 40 pies; los relevos se mantenían apartados de los piquetes; se había desalojado al público; las personas entraban y salían del edificio sin ser molestadas; se estaba publicando el periódico y los camiones entraban y salían libremente a recogerlo y distribuirlo; la Policía mantenía tres turnos de cincuenta agentes cada uno para vigilar los piquetes y los alrededores del edificio, y ofrecía, además, protección especial a todos los vehículos de la peticionaria y a cualquier empleado que lo requiriese; por lo menos desde el día 4 habían cesado las agresiones contra los empleados del periódico y los ataques a la propiedad de éste y sólo restaban algunas peleas ocasionales entre los miembros de las dos uniones (sobre las circunstancias específicas de estas peleas no hay nada en la prueba, pero sí sabemos que la Policía afirmó que "las controlaba") ; todas las personas que habían cometido actos de violencia habían sido arrestadas inmediatamente y se habían sometido los casos a las autoridades competentes.

¿Dónde está, pues, el "persistente estado de violencia y coacción" mantenido por los demandados? Los hechos demuestran incontestablemente que no existía a la fecha en que se solicitó el *injunction*, ni a la fecha en que se dictó la sentencia y que la Policía daba a la peticionaria, a su pro-

piedad, y a sus empleados y visitantes, una protección completamente adecuada.

El requisito jurisdiccional de la Ley Norris-La Guardia y de nuestra Ley de 1947 que prohibe a un tribunal conceder un *injunction* en una disputa obrera a menos que se pruebe "que los funcionarios públicos encargados del deber de proteger la propiedad del querellante no pueden o no están dispuestos a proporcionar la protección adecuada", no es solamente una de las innovaciones más radicales de esa legislación, sino también una de carácter fundamental. Es una clara reafirmación legislativa del elemental principio que asigna al ejecutivo la función de conservar la paz y el orden públicos, y una severa admonición a los jueces de mantenerse fuera, lo más posible, del desempeño de ese oficio. Históricamente, tuvo el propósito de corregir la difundida actitud de los jueces federales de expedir órdenes contra las actividades obreras simplemente a base de alegaciones o prueba *sobre actos de violencia*, sin reconocer que los remedios ordinarios para esos actos se hallaban en las acciones criminales y de daños. "La violencia y otras alteraciones de la paz constituyen, admitidamente, la preocupación primaria de la Policía y de la maquinaria del derecho penal. Por consiguiente, el requisito de que el peticionario pruebe a satisfacción de la corte que los recursos normales del gobierno 'no pueden o no están dispuestos a proporcionar la protección adecuada' da énfasis a la responsabilidad oficial y, además, elimina peligrosos atajos en el cumplimiento de la ley penal." Frankfurter y Greene, *ob. cit.* supra, pág. 222

Un examen detenido de la jurisprudencia federal comprueba a la saciedad que los jueces federales han tenido muy presentes esos propósitos legislativos y han dictado órdenes de *injunction* contra actos de violencia y fraude sólo cuando la prueba ha demostrado palmariamente la gravedad de esos actos y la clara inhabilidad de la policía para ofrecer una adecuada protección. A continuación presento una lista lo más completa que me ha sido posible de los precedentes fede-

rales.(⁹) En ella se hacen constar, en apretada síntesis, los hechos de fraude y violencia y la actuación de la policía.

*Casos en los cuales se denegó la orden*

| Casos | Actos de fraude y violencia | Actuación de la policía |
|---|---|---|
| 1. *Grace Co.* v. *Williams*, 96 F.2d 478 (Cir. 8, 1938). | Agresiones graves, intimidaciones y amenazas contra los empleados tanto frente al negocio como en el camino hacia sus casas; intervención violenta con las entregas; destrucción de la mercancía. | Se niega la orden porque la demanda no alegó específicamente la falta de protección adecuada, aunque el demandante ofreció presentar esa prueba en la vista. |
| 2. *Green* v. *Obergfell*, 121 F.2d 46 (D. C. Cir. 1941). | Diversos actos de agresión y violencia; bombas contra los camiones y tiendas, rotura de ventanas; se le vaciaban las gomas a los camiones. | "El testimonio no demuestra falta de disposición o incapacidad de parte de los funcionarios de la paz para ofrecer protección adecuada, o que los actos ilegales no hubiesen sido suprimidos y los culpables castigados mucho antes de la vista del presente caso." (Págs. 53–54.) Habían transcurrido 4 años entre los sucesos y el juicio. |
| 3. *International Brotherhood of Teamsters* v. *International Union of United Brewery... Workers of America*, 106 F.2d 871 (Cir. 9, 1939). | Reinado de violencia e intimidación (no se especifican los hechos). | Se deniega porque ni las alegaciones ni las conclusiones del tribunal de instancia mencionaban la falta de adecuada protección. |

(⁹) No he hallado una sola sentencia del Tribunal Supremo federal que discuta la cuestión específica.

| Casos | Actos de fraude y violencia | Actuación de la policía |
|---|---|---|
| 4. *Wilson & Co.* v. *Birl,* 105 F.2d 948 (Cir. 3, 1939). | Piquetes (10 a 15 personas y en una ocasión 97) del negocio del patrono y de los negocios de sus clientes para persuadirlos, como efectivamente lo hicieron, de no comprar los productos del patrono; muy poca violencia en general, solamente tres o cuatro actos específicos; el negocio está virtualmente paralizado. | La policía dio protección a la propiedad física; tenía la situación "bajo supervisión y control". |
| 5. *Carter* v. *Herrin Motor Freight Lines,* 131 F.2d 557 (Cir. 5, 1942). | Actos de violencia contra el demandante y su propiedad; amenazas e intimidación a los clientes. | El Jefe de la policía declaró que dio protección y mantuvo el orden frente al negocio; que le había dado protección normal a los vehículos del patrono; la policía no colocó un agente en cada uno de los camiones como el patrono había solicitado. |
| 6. *Heintz Mfg. Co.* v. *Local No. 515,* 20 F. Supp. 116 (E. D. Pa. 1937). | Línea de piquetes que variaba en número llegando a veces de 200 a 300 a las horas de entrada y salida de la factoría; insultos y epítetos oprobiosos y una persona fue empujada; numerosos actos de violencia y amenazas en las casas de los empleados y en otros sitios, pero no hay prueba de que estos | Mantuvo una fuerza de 15 a 60 policías correspondiendo a los aumentos en el número de piquetes; en ocasiones separaba los piquetes para permitir a las personas entrar; no hubo intervención con la policía en sus funciones. |

| Casos | Actos de fraude y violencia | Actuación de la policía |
|-------|------------------------------|--------------------------|
| | actos los cometieran los demandados o los autorizaran o ratificaran. | |
| 7. *Cupples Co. v. American Federation of Labor,* 20 F. Supp. 894 (E. D. Mo., 1937). | Piquete en masa frente a la factoría y en las calles adyacentes, amenazas de violencias, intimidaciones e insultos y de esa manera se atemoriza a los empleados para no continuar en el trabajo. Se cerró la factoría y no pudo reabrirse. | "El testimonio demuestra que la ciudad de San Luis ha estado muy activa y celosa en el desempeño de su deber de proveer protección policíaca. Consta de la evidencia que el Departamento d e Policía respondió inmediata y eficientemente cuando se le llamó para patrullar la propiedad de la demandante o para proveer escoltas a los empleados de la demandada." (Pág. 898.) |
| 8. *Knapp-Monarch Co. v. Anderson,* 7 F. Supp. 332 (E. D. Ill. 1934). | Piquete de 250 o más que bloquea la entrada de la factoría, la acera y las calles durante todo el día y parte de la noche; numerosos actos de violencia y de intimidación que impiden a los empleados entrar y obliga a cerrar la factoría; pedradas, persecuciones en carro, agresiones; se impide la entrada de vehículos. | Se envían de dos a siete agentes durante el piquete en masa y los actos de violencia e intimidación; el alguacil en algunos días envió dos más que "no ayudaron mucho". La corte concluye que no se dio adecuada protección durante los primeros días de la huelga pero se negó a conceder el *injunction* especificando que la falta de adecuada protección se debía a que los oficiales consideraban que no tenían facultad legal para prohibir el pi- |

| Casos | Actos de fraude y violencia | Actuación de la policía |
|---|---|---|
| | | quete en masa. La corte les instruyó que sí tenían ese poder. |
| 9. *Donnelly Garment Co.* v. *Dubinsky,* 154 F.2d 38 (Cir. 8, 1946). | Graves actos de fraude y violencia en varias ciudades realizados por muchedumbres de mujeres. | Se deniega la orden porque h a b í a n transcurrido varios años entre la fecha de los sucesos y el juicio ante el tribunal de instancia y no había prueba de que los nuevos funcionarios de las ciudades habrían de negarse, como lo habían hecho sus predecesores, a dar la protección adecuada, si se hacía necesaria. |

## Casos en los cuales se concedió la orden.

| | | |
|---|---|---|
| 1. *Toledo, P. & W. R. R.* v. *Brotherhood of Trainmen,* 132 F.2d 265 (Cir. 7, 1942). Revocado por otros motivos en 321 U. S. 50 (1943). | Asaltos y lesiones contra los empleados, paralización y daños a los trenes, actos repetidos de violencia ocurridos a lo largo de las líneas del ferrocarril que cubren varios estados. | Los alguaciles de los condados por los cuales atravesaba la línea del ferrocarril se negaron a ofrecer la mínima protección por no tener los hombres necesarios para hacerlo. |
| 2. *Lake Valley Farm Products, Inc.* v. *Milk Wagon Drivers Union,* 108 F. 2d 436 (Cir. 7 1939). Revocado por | Piquetes de todas las tiendas que distribuyen el producto del patrono, ventanas rotas, bombas, fuegos, b o m b a s apestosas, maquinaria y camiones destruidos. Se impide la entrada de otros | "Creemos que es claro a base del número de tiendas afectadas y la magnitud y seriedad de las actividades que han continuado por varios años que los funcionarios de la policía estaban incapacita- |

| Casos | Actos de fraude y violencia | Actuación de la policía |
|---|---|---|
| otros motivos en 311 U. S. 91 (1940). | productos; la situación dura varios años. | dos para controlar la situación." (Pág. 443.) |
| 3. *Cater Construction Co.* v. *Nischwitz,* 111 F.2d 971 (Cir. 7, 1940). | Doce o quince carros llenos de piquetes llegaron al negocio, amenazaron a los trabajadores usando lenguaje obsceno, cometieron u n a agresión b r u t a l contra uno y obligaron a los demás por medio de la intimidación a abandonar el trabajo. Actos similares de violencia e intimidación continuaron por varios días. | El alguacil se negó a dar protección por no tener las facilidades o los medios económicos p a r a proteger los proyectos de construcción en el condado; el jefe de la policía de una ciudad se negó también por tener un sólo agente y le aconsejó al patrono acceder a lo que la unión pedía. |
| 4. *Farmer Grain Co.* v. *Toledo, P. & W. R. R.,* 158 F.2d 109 (Cir. 7, 1947) Revocado en 332 U. S. 748 (1947) por haberse convertido en académico (moot). | Estado de violencia durante más de un año que justifica la afirmación de que existía un estado de guerra civil entre las partes. El ferrocarril no había p o d i d o funcionar durante largo tiempo. La disputa había crecido en intensidad y había producido ya tres muertes. | A pesar del tiempo transcurrido, la situación no había sido aliviada por la intervención de la policía. |
| 5. *Newton* v. *Laclede Steel Co.,* 80 F.2d 636 (Cir. 7, 1935). | Actos repetidos de violencia, tiros y bombas que obligaron a los empleados a quedarse en la factoría durante varios días; muchedumbre de dos a tres cientos hombres armados que asaltaron e | El alcalde, el jefe de la policía, el alguacil y el fiscal declararon que no habían podido mantener la paz y que no podrían hacerlo si se reanudaba la violencia. |

| Casos | Actos de fraude y violencia | Actuación de la policía |
|---|---|---|
| | hirieron a varios empleados y que se mantuvieron durante un mes frente a la planta. Los huelguistas amenazaron con reanudar la violencia tan pronto se eliminara una orden de *injunction* dictada por el tribunal de instancia. | |
| 6. *J. B. Michael & Co., Inc.* v. *Iron Workers Local No. 782*, 173 F. Supp. 319 (W. D. Ky., 1959). | Se tiran piedras, se usan picos y barras de hierro, se rompen los parabrisas y los cristales de las ventanillas de los automóviles y camiones. Nueve empleados heridos, de los cuales siete tuvieron que ser hospitalizados. Se mostraron dos pistolas y tuvo que abandonarse el trabajo en el proyecto de construcción. | Se solicita ayuda del alguacil pero éste, debido a la insuficiencia de sus fuerzas, no pudo darla y en ningún momento realizó esfuerzo alguno para mantener el orden o impedir la violencia. |
| 7. *Tri-plex Shoe Co.* v. *Cantor*, 25 F. Supp. 996, 27 F. Supp. 295 (E. D. Pa., 1939). | No se explican los actos de violencia, excepto para decir que eran injustificados. | La información es muy escasa; sólo se dice que la policía dio toda la protección que le era posible dar y que a pesar de eso se había utilizado la violencia. |
| 8. *Lake Charles Stevedores, Inc.* v. *Mayo*, 20 F. Supp. 698 (W. D. La., 1935). | Piquetes de 250 a 300 hombres; cientos de tiros; cuatro muertos y seis heridos. | El alguacil envió sólo dos agentes y el Gobernador se negó a enviar agentes de la policía estatal o unidades de la Guardia Nacional. |

Esta incursión en la jurisprudencia federal([10]) demuestra palpablemente el cuidado con que han procedido esos tribunales en su afán de dar plena vigencia a los propósitos de la Ley Norris-La Guardia. De la misma manera han actuado los tribunales del estado de Nueva York, donde también existe una ley muy parecida a la federal.([11]) *Busch Jewelry Co., Inc.* v. *United Retail Employees Union,* 22 N.E.2d 320 (1939), 5 N.Y.S. 2d 575 (1938); *May's Fur and Ready to Wear, Inc.* v. *Bauer,* 26 N.E.2d 279 (1940); *Remington Rand, Inc.* v. *Crofoot,* 289 N.Y.S. 1025 (1936); *Grandview Dairy, Inc.* v. *O'Leary,* 285 N.Y.S. 841, 844–845 (1936); *Strauss* v. *Steiner,* 18 N.Y.S.2d 395, 402 (1940); *Carl Ahlers, Inc.* v. *Papa,* 65 N.Y.S.2d 867 (1946); *Hearn Department Stores, Inc.* v. *Livingston,* 125 N.Y.S.2d 187 (1953); *Miller* v. *Gallagher,* 28 N.Y.S.2d 606, 610–612 (1941). De esta última sentencia, son las siguientes sabias palabras del Juez Hofstadter:

"Para llegar a esa conclusión [que no se ofreció protección adecuada], el expediente tendría que demostrar actos de violencia repetida, los cuales no se castigaron o con los cuales no se intervino por el letargo o la inhabilidad de la policía para intervenir. De la prueba en este caso no puede inferirse tal cosa. Por el contrario, en todos los incidentes de violencia informados, inmediatamente se registró una competente actuación de la policía; por lo menos en cuanto a los actos que tuvieron lugar en la escena de la disputa. Ni tampoco los actos de violencia en la escena de la disputa fueron tan numerosos como para crear la clase de absoluta confusión que le haría difícil actuar a la policía. La ley penal es un *injunction* continuo contra la

---

([10]) Examínense, además, *Cinderella Theater Co.* v. *Sign Writers' Local Union,* 6 F. Supp. 164, 171 (E. D. Mich. 1934); *United Packing House Workers of America* v. *Wilson & Co.,* 80 F. Supp. 563, 570 (N. D. Ill., 1948); *General Electric Co.* v. *Gojack,* 68 F. Supp. 686, 687–688, 691 (N. D. Ind., 1946); *International Ass'n of Bridge...Workers* v. *Pauly Jail Bldg. Co.,* 118 F.2d 615 (Cir. 8, 1941) en los cuales se toca el problema de "protección adecuada", pero que se resuelven por otras consideraciones.

([11]) Debo aclarar, sin embargo, que en Nueva York se mantiene la doctrina de la legalidad de los "objetivos" en todo su vigor. Véanse varios de los casos citados y *Meltex, Inc.* v. *Livingston,* 145 N.Y.S.2d 858 (1955).

violencia, y las cortes penales, como cuestión original, constituyen el foro donde se debe acusar y enjuiciar a los individuos que han alterado la paz.

"Utilizar a una corte de equidad en el desempeño de las funciones de una corte criminal es una grave responsabilidad y la cual debe evitar la corte de equidad, en vista de la política del estado declarada en una ley. No está sin el respaldo de autoridades el criterio de que, aun en ausencia de esa política así declarada, una sabia administración de la justicia hubiese ayudado a la causa de las mejores relaciones obrero-patronales mostrando una mayor timidez al entrar en la arena de la disputa obrera armada con el procedimiento de *injunction*.

"Aunque el Juez señor Frankfurter dijo en el caso de *Meadowmoor* que los tribunales 'no encuentran nada en la Enmienda XIV que impida a un estado, si así lo desea, poner su confianza en el decreto de un canciller y que le obligue a depender exclusivamente del rotén de un policía', los tribunales de este estado están obligados por el claro mandato de la ley a referir, en la mayor extensión posible, los actos esporádicos de violencia a la protección de las autoridades policíacas, y a utilizar el decreto del canciller sólo cuando se pruebe que esa protección es inadecuada. Unicamente cuando los actos de violencia sean tan múltiples y repetidos que constituyan una amenaza continua y persistente a la paz y el orden futuros, con daños inminentes a la persona y a la propiedad, es que estaría justificada la intervención del brazo de la equidad, ya que el remedio de *injunction* no está disponible como un castigo para una ofensa pasada." (Págs. 610–611.)

¿Cuáles han de ser los índices que deben utilizarse para determinar si en una disputa obrera es o no "adecuada" la protección policíaca? Sin duda, cada situación debe medirse de acuerdo con los elementos específicos que la integran, pero ese principio básico que tiene vigencia en todos los pleitos no puede apartarnos del cumplimiento de nuestra función cardinal de orientar el derecho. Especialmente por ser ésta la primera controversia de esa índole en que intervenimos y por tratarse de un problema vital en nuestro desarrollo social y económico, debemos exigirnos la mayor reflexión y objetividad posibles. Entresacados de la abundante jurispru-

dencia federal y de Nueva York que he examinado, y de la historia y la experiencia cotidiana, creo que los siguientes índices ayudarían considerablemente a despejar la situación:

1. la extensión del conflicto—número de personas, distancias y tiempo;

2. la intensidad del conflicto en términos de las cuestiones que separan a las partes y de las emociones que se han producido;

3. el número y la gravedad de los actos específicos de violencia y fraude;

4. el efecto de esos actos sobre la propiedad y el negocio del patrono, a diferencia de los efectos causádoles por las actividades legítimas, como la huelga y el piquete;

5. la prontitud, energía y firmeza desplegadas por las autoridades públicas;

6. el número de agentes asignados al conflicto en proporción a la extensión e intensidad de éste;

7. si a los supuestos autores de los actos de fraude y violencia se les arrestó y encausó prontamente;

8. la efectividad de la intervención policíaca comprobada a base de la desaparición total o la reducción drástica de los actos de fraude y violencia, y de la continuación o reasunción del negocio si los mencionados actos (a diferencia de las actividades legítimas) amenazaron con causar el cierre o si efectivamente lo causaron;

9. la existencia en la comunidad de otros conflictos de la misma índole que obliguen a la fuerza pública a dividir su atención y sus efectivos;

10. el criterio de los funcionarios públicos sobre la capacidad de la policía para dominar los actos de fraude y violencia y ofrecer la protección adecuada;

11. el tiempo transcurrido entre los actos de fraude y violencia y la demanda y la vista;

12. la razonable probabilidad, medida por los anteriores factores, de que los actos de fraude y violencia han de continuar cometiéndose a menos que se dicte la orden de *injunction;* o en otras palabras, el convencimiento de que la orden de *injunction* es necesaria no para castigar los actos pasados sino para asegurarle al patrono el futuro disfrute de sus derechos de propiedad libre de repetidos y graves actos de fraude y violencia.

Muy pocas situaciones podrán resolverse mediante la aplicación de uno o dos de estos índices. En la inmensa mayoría de los casos probablemente será necesario usarlos todos. Así es en el pleito presente. No tengo la menor duda de que aplicados a los hechos de este pleito, no existe otra alternativa sino la de confirmar las conclusiones del juez de instancia.

Por todas las razones que he señalado, estoy plenamente convencido de que la Policía ofreció a la peticionaria la "protección adecuada" que la ley menciona y que, en consecuencia, el tribunal sentenciador actuó correctamente al negarse a expedir la orden de *injunction*.

Unas palabras finales. Es obvio que nada de lo que he expresado puede interpretarse como tolerancia y mucho menos aprobación de la violencia y el fraude. Actos de esa naturaleza constituyen claras violaciones de nuestras leyes penales y de una de las normas básicas de la convivencia social. Cuando los trabajadores los utilizan como arma de coacción constituyen, además, una negación de la historia del movimiento sindical y del principio de libertad personal tenazmente defendido por ellos a costa de vida y hacienda, durante largas y amargas décadas, y frente a la abierta y a ratos brutal oposición de los empresarios y muchas veces de las autoridades públicas.

Esa repulsión hacia el fraude y la violencia y hacia aquéllos—patronos o empleados—que los utilizan esporádica o sistemáticamente como instrumentos de coacción, no puede, sin embargo, apartarnos en ningún caso de cumplir con la norma judicial de resolver cada asunto a base de los hechos específicos probados y no de las afirmaciones generales o conclusiones de los testigos, y la de guardar celosa observancia de los propósitos claramente expresados en las leyes. Entiendo que esas normas nos obligan en este caso a confirmar la sentencia apelada.